776 A.2d 828 (2001)
342 N.J. Super. 273
Frank HILL and Antoinette Hill, Plaintiffs-Respondents/Cross-Appellants,
v.
NEW JERSEY DEPARTMENT OF CORRECTIONS COMMISSIONER William FAUVER, Jacqueline Owens, Communications Workers of America, Defendants, and
Frank Budd, June Peterson, and Paul Alexander, Defendants-Appellants/Cross-Respondents, and
State of New Jersey, New Jersey Department of Corrections, and Communications Workers of AmericaLocal 1038, Defendants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted April 4, 2001.
Decided June 18, 2001.
*834 Farrell & Thurman, Princeton, for appellants/ cross-respondents Frank Budd and June Peterson, and cross-respondents State of New Jersey and Department of Corrections, and Weissman & Mintz, Somerset, for appellant/cross-respondent Paul Alexander, and cross-respondent Communications Workers of AmericaLocal 1038 (John L. Thurman, Princeton and James M. Cooney, Somerset, of counsel and on the joint brief).
Carmen R. Faia, Pleasantville, for respondents/cross-appellants.
Before Judges KEEFE, STEINBERG and WEISSBARD. *829 *830 *831 *832
*833 The opinion of the court was delivered by STEINBERG, J.A.D.
Defendants Frank Budd, June Peterson and Paul Alexander appeal from a judgment entered against them after a jury trial in an action brought by plaintiffs Frank and Antoinette Hill[1] alleging, inter alia, conspiracy, tortious interference with economic advantage, and intentional infliction of emotional distress. Plaintiffs cross-appeal, contending that the trial judge erred in dismissing their claim brought pursuant to the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, and in otherwise dismissing the claims brought against defendants State of New Jersey, New Jersey Department of Corrections, and Communications Workers' of America Local 1038 (Local 1038).
Plaintiffs' eleven-count complaint alleged: violation of the Conscientious Employee Protection Act (count one); retaliatory discharge (count two); breach of employee handbook (count three); breach of the covenant of good faith and fair dealing (count four); conspiracy to file false sexual harassment charges (count five); sexual harassment (count six); tortious interference with business, economic and contractual relations (count seven); intentional infliction of emotional distress (count eight); negligent hiring and retention (count nine); entitlement to punitive damages (count ten); and a per quod claim (count eleven). Named as defendants were Frank Budd, June Peterson, Paul Alexander, Jacqueline Owens,[2] the State of New Jersey, the New Jersey Department of Corrections, Department of Corrections Commissioner William C. Fauver, the Communications Workers' of America (CWA), and Local 1038.
As a result of either the grant of summary judgment on certain counts, or the voluntary dismissal by plaintiff of other counts, the case proceeded to trial against *835 Peterson, Owens, Budd and Alexander on counts five, seven, eight and eleven. The jury found in favor of plaintiffs, and apportioned liability as follows: Owens, twenty-five percent; Peterson, thirty-five percent; Budd, twenty percent, and Alexander, twenty percent. The jury awarded plaintiff monetary damages of $137,436 for economic loss, and $150,000 for physical and emotional injury, and also awarded $15,000 to Antoinette Hill on her per quod claim. In addition, the jury awarded punitive damages of $4,000 against Peterson, $8,000 against Owens, and $18,000 against Alexander. The jury did not impose punitive damages against Budd.
The facts critical to the resolution of the legal issues raised by the appeal and cross-appeal are the following. At trial, Manor Woods was described as an institution maintained by the Department of Corrections to house juveniles who had been sent there as a result of an adjudication of a delinquency. Most of the juveniles came from broken homes, were emotionally disturbed, suffered from learning disabilities, and had prior records. It was considered an alternative to incarceration in a juvenile penal institution. The juveniles were given group counseling and vocational training. Group meetings were conducted in which the juveniles were encouraged to say what was on their mind. The purpose of the house meetings was to teach the juvenile residents that they should learn to speak out and discuss issues of dispute, rather than resort to violence.
In August 1976, following the death of his son in a fire that had been intentionally set by several juveniles, plaintiff Frank Hill, a Vietnam veteran, decided to pursue a career in social work. He obtained his degree in 1981 at age thirty-one, and began working as a youth counselor at Manor Woods. In September 1987, he became superintendent of the facility. During his tenure, the staff at Manor Woods utilized a concept known as guided group intervention, which he described as a "peer concept." Regular house meetings were conducted to establish daily agendas, discuss disciplinary actions, and allow the inmates to voice any concerns.
In August 1989, plaintiff hired defendant Jacqueline Owens as a teaching assistant. She was twenty-four years old. In February 1990, he hired forty-two-year-old defendant June Peterson to teach basic skills, mathematics and science. Plaintiff said that Peterson explained during her interview that she had left her tenured job as a school teacher in Bridgeton after over twenty years of service because she wanted to relocate after a divorce.
Unfortunately, the addition of Peterson and Owens to the Manor Woods staff had a disruptive effect upon the inmate population. Both Owens and Peterson elected to dress provocatively in tight and revealing clothing, often without underwear. Joan Carter-El, plaintiff's secretary, observed Peterson on different occasions sitting on a desk in front of a room of inmates in a short skirt, with her legs apart. Moreover, on occasion, she observed Peterson massaging inmates' shoulders in an inappropriate manner, and demonstrating pelvic thrust exercises during gym class while lying on the floor in a skirt. On one occasion, Carter-El claimed she interrupted Owens and some inmates who appeared to be masturbating.
Plaintiff began to suspect that Owens and Peterson had become involved with two inmates. He heard that Owens had exposed her breasts to an inmate. Other inmates began to complain about the time Peterson spent with V.P., and the time Owens spent with C.L. In addition, on one occasion, Anne Webb, the cook at Manor Woods, observed Owens engaged in a passionate *836 kiss with C.L. in front of other residents.
On February 14, 1992, Assistant Superintendent Christopher M. Martin conducted a house meeting with the inmates. Peterson and Hill were not in attendance. At this meeting, a number of inmates again complained about the extra attention and gifts Owens and Peterson had been giving to C.L. and V.P. They alleged that there was sexual activity going on between the women and the two inmates. After listening to the complaints, Martin adjourned the meeting because he felt Owens and Peterson should be given an opportunity to be present and respond to the allegations.
After speaking with Martin, plaintiff scheduled a follow-up meeting for February 18, 1992. Plaintiff felt it was appropriate to address the allegations at a house meeting because that was how the program was run. At the follow-up meeting, some of the inmates produced a teddy bear and cards given by Owens to C.L., as well as jewelry given to V.P. by Peterson, and several incriminating pages from Peterson's journal.
At one point during the meeting, Owens began cursing at some of the inmates, and Anne Webb confronted Owens with observations she had made of Owens kissing C.L. Owens responded by calling Webb a "f____________ liar," and a number of other inmates began to defend Webb. Plaintiff asked everyone, including Owens, to sit down. According to plaintiff, the inmates referred to sexual activity between Peterson, Owens and the inmates. Although Peterson sat in the back of the room, with her head down, crying, plaintiff said she never denied the allegations.
After the meeting, plaintiff spoke to Owens and Peterson and advised them that he had checked with the Personnel Department about instituting disciplinary action against them. He stated that he was recommending that Owens be fired and that Peterson receive a fifteen-day suspension. He said Owens uttered a profanity, and left the room. Peterson was crying, begged plaintiff not to fire her, stating that she did not want to lose this job as she did in Bridgeton, because it would be difficult for her to find another job.
While the disciplinary charges against Owens and Peterson were pending, both continued to work at Manor Woods. They filed a grievance alleging that the February 18, 1992 meeting was conducted in a demeaning, unprofessional manner. Although Peterson and Owens did not prevail on their grievance, plaintiff and Martin were advised to modify the house meeting practice so that employee performance or other behavior would be discussed in private meetings between the supervisor and the employee. Meanwhile, Peterson and Owens contested the disciplinary charges that had been filed against them. They were assisted in their efforts by defendant Paul Alexander, the President of their union, Local 1038, who met with them at a local restaurant on at least five separate occasions between March and August 1992. During these meetings, Peterson and Owens informed Alexander that, in addition to the house meeting, plaintiff had been sexually harassing them ever since they began working at Manor Woods.
At Alexander's request, Peterson and Owens prepared statements detailing the harassment they claimed to have suffered at the hands of plaintiff. From the wording of their statements, he felt each had reviewed the other's statement before submitting it to him.
Thereafter, Alexander was contacted by defendant Frank Budd, the Temporary Director of the Equal Employee Opportunity Office within DOC. Budd had learned of *837 the house meeting as well as the allegations of sexual harassment, and wanted to meet with Owens and Peterson. Accordingly, he joined Alexander, Owens and Peterson at some of their meetings.
Budd also met with plaintiff. According to plaintiff, during his initial conversation with Budd regarding the allegations, he was given the impression that he did not need a lawyer since Budd would represent him. Plaintiff suggested that Budd interview several inmates, but, according to plaintiff, he never did.
Meanwhile, the disciplinary hearing against Peterson and Owens was held on August 7, 1992. Although plaintiff had requested assistance in preparing and presenting his case, he claimed he received no help and was unsuccessful in establishing the charges against Owens and Peterson.
Shortly thereafter, plaintiff called Budd to discuss his own situation, and Budd advised him that he had determined that there was probable cause to sustain the allegations against him. Budd told plaintiff that he could not speak to him further since he would be representing Owens and Peterson. In October 1992, plaintiff received formal notice that a disciplinary action had been instituted against him seeking his termination for conduct unbecoming a State employee based upon the complaints of Owens and Peterson. These charges were subsequently made public by Alexander in a November 1992 CWA newsletter. After a hearing, the charges against plaintiff were dismissed.
Thereafter, plaintiff decided to use two months of accumulated sick time. He also obtained counseling to deal with the anxiety and depression he was experiencing as a result of the charges and hearing. Shortly thereafter he requested a transfer, and ultimately accepted a position as court liaison officer. Plaintiff maintained he would never return to, and had, in fact, turned down, a position involving supervisory responsibilities because he was afraid of again being charged with sexual harassment. While he suffered no loss of income as a result of the transfer, plaintiff stated that, unlike his former job, there was no room for advancement in his current position.
Plaintiff further testified that, as a result of the charges, he became withdrawn, experienced continuous headaches, frequent upset stomach, insomnia, and felt stressed all of the time. Dr. Robert Pasahow, a psychologist, evaluated plaintiff and concluded that he suffered clinical depression and post-traumatic stress disorder caused by the false accusation of sexual harassment. He opined that plaintiff would "experience permanent, anxious and depressed symptoms, and be uncomfortable in dealing with female co-workers."
Carter-El testified she had never seen plaintiff sexually harass anyone at Manor Woods. In addition, according to Carter-El, Peterson had told her that she had not wanted to file charges against plaintiff and that it had been Alexander's idea. Martin also testified that he had never seen plaintiff sexually harass anyone.
At trial, V.P. testified that Owens dressed in a provocative manner, wearing tight clothes and loose blouses. He said Owens would wear loose blouses, bend over to show her breasts and rub them against inmates. He said he began to touch Owens in an inappropriate manner, and she just smiled at him, and he felt that meant he was given "the green light." Ultimately, they engaged in sexual intercourse. He also said Peterson would dress in "short shorts," and "tight spandex pants and clothing." He said he began kissing Peterson in the classroom, and it developed into "open mouth kisses," in front of students. He described an incident *838 when he walked into a closet, saw Peterson, and digitally penetrated her vagina. She did not object. He also described a number of incidents when Peterson drove him to the park, they would kiss and hug, and she would masturbate him to ejaculation. Later, she began to perform oral sex upon him.
V.P. also testified that after the January 1992 meeting, he met with Peterson, Owens and C.L.,[3] whom he understood to be having a sexual relationship with Owens. According to V.P., Peterson and Owens expressed their displeasure with plaintiff, since they were "tired ... of getting heat... about what's going on," and "wanted to plot a way ... to get [plaintiff] in trouble." Peterson decided to claim she had been sexually harassed by plaintiff in order to get him fired.
In January 1992, at a house meeting, the group members complained that V.P. and C.L. were becoming too close to the teachers. After that meeting, plaintiff cautioned Owens and Peterson that they would be disciplined if things did not improve. He advised them that they would either be suspended or fired.
According to Fauver, it was his practice to routinely approve Budd's recommendations so that disciplinary matters could be resolved through hearings. Budd never told him that Hill had filed disciplinary charges against Peterson and Owens alleging that they were unduly familiar with the inmates. Morever, Budd never told him that the charges included findings of a teddy bear, cards, and love letters taken from the inmates rooms and acknowledged to have been given them by the employees. In addition, Budd never told Fauver that he had not talked to any of the inmates. He acknowledged that it would be a violation of departmental rules to give gifts or cards to inmates. In addition, Budd never told Fauver that Owens and Peterson contemplated filing a law suit against DOC.[4] Fauver acknowledged that the validity of the charges filed by Hill against Owens and Peterson should have been considered in analyzing the legitimacy of their charges against plaintiff. He also agreed that Budd should probably have talked to the inmates.
Plaintiff testified that Budd may have acted against him because of certain actions Frank Gripp, Deputy Director of the Division of Juvenile Services, within DOC, had taken against Budd, pointing out that Budd had once referred to plaintiff as "Gripp's boy." Indeed, upon learning of the charges against plaintiff, Gripp had written to Fauver to protest Budd's handling of the case, questioning Budd's objectivity as well as the credibility of the complainants. Gripp described the investigation which had been conducted as "one-sided," and requested that an independent investigator be assigned to re-evaluate the case. However, Fauver declined to intervene.
Peterson testified and denied having a sexual relationship with V.P. However, she acknowledged that plaintiff had cautioned her to be careful because V.P. was developing a crush on her, and also agreed that both plaintiff and Martin had warned her not to touch the inmates because such actions could be misconstrued. She insisted that she had been sexually harassed by plaintiff throughout her tenure at Manor Woods. She denied meeting with Owens, V.P., and C.L. in February 1992 to discuss bringing false sexual harassment charges *839 against plaintiff, and also denied that she had admitted to plaintiff that her allegations were not truthful.
On this appeal, Peterson, Budd and Alexander raise the following arguments: (1) their conduct was protected by the litigation privilege; (2) the trial judge erred in denying summary judgment and judgment notwithstanding the verdict on all claims since they were barred by the waiver provision of CEPA; (3) the trial judge erred in denying summary judgment and judgment notwithstanding the verdict on the claim of intentional infliction of emotional distress because their conduct was not sufficiently outrageous to support such a claim; (4) the trial judge erred in denying summary judgment and judgment notwithstanding the verdict on the claim of tortious interference with business, economic and contractual relations because the disciplinary charges filed against Hill had sufficient factual merit, that, as a matter of law, such charges cannot establish malice, and in addition, Alexander had no power to recommend disciplinary charges against Hill; (5) the trial judge erred in denying summary judgment and judgment notwithstanding the verdict on the claim of conspiracy because there was insufficient evidence of a conspiracy; (6) the trial judge erred in denying summary judgment and judgment notwithstanding the verdict on the per quod claim of Antoinette Hill because defendants "have no liability that supports this derivative claim;" (7) they are entitled to a new trial based on plaintiff's injection of the issue of race at trial, the trial court's failure to instruct the jury that no evidence connects any defendants to an alleged scheme to influence the testimony of inmate witnesses, and the improper admission into evidence of allegations of embezzlement against Peterson; and (8) the damage awards are not supported by the record.
On their cross-appeal, plaintiffs contend that the trial judge erred in granting summary judgment on the CEPA claim, and also that the trial judge erred in granting summary judgment in favor of the State of New Jersey, DOC, and Local 1038.
We first consider defendants' contention, raised for the first time on appeal, that all of the statements made, and actions undertaken by them in connection with the disciplinary charges filed against plaintiff were protected by an absolute privilege and were, therefore, not actionable. Initially, we are troubled by the belated assertion of the claim. Ordinarily, an appellate court will decline to consider an issue not presented to the trial judge unless it goes to the jurisdiction of the court, or concerns a matter of substantial public interest. Alan J. Cornblatt, P.A. v. Barow, 153 N.J. 218, 230, 708 A.2d 401 (1998); Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973). Even if the issue belatedly raised on appeal satisfies that test, we will not consider it if the appellate record is not complete as to the newly-presented issue thus precluding or hindering proper resolution of the claim. Cornblatt, supra, 153 N.J. at 230, 708 A.2d 401. The mere fact that the issue is sought to be raised by public employees seeking to overturn an award of damages against them does not elevate the issue to one of sufficient public concern. See, for example, Regan v. City of New Brunswick, 305 N.J.Super. 342, 357, n. 6, 702 A.2d 523 (App.Div.1997); Chubb Group v. Trenton Bd. of Educ., 304 N.J.Super. 10, 19-20, 697 A.2d 952 (App. Div.), certif. denied, 152 N.J. 188, 704 A.2d 18 (1997). Nor do we believe that the litigation privilege so implicates the public interest that we are obliged to consider it for the first time on appeal.
The litigation privilege may be waived if not raised at trial. Lightning *840 Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1197 (3d Cir.1993). We make these observations notwithstanding the fact that our Supreme Court has acknowledged the litigation privilege to be the bedrock of an effective and smoothly operating judicial system. Hawkins v. Harris, 141 N.J. 207, 222, 661 A.2d 284 (1995). Nevertheless, because we believe the issue is legal in nature and can be decided on the record presented without the necessity of additional factual presentations or determinations, as well as for the sake of completeness, we elect to consider it.
A statement made in the course of judicial, administrative, or legislative proceedings by a litigant or other trial participant is absolutely privileged and wholly immune from liability. Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 563, 569 A.2d 793 (1990) (citing Rainier's Dairies v. Raritan Valley Farms, 19 N.J. 552, 558, 117 A.2d 889 (1955)). This privilege, known as the litigation privilege, is premised upon the belief that the public interest in having free access to judicial and quasi-judicial bodies without being restrained by the possibility of an ensuing law suit for damages is paramount to the public policy that an individual's reputation or business not be wrongly interfered with. Rainier's Dairies, supra, 19 N.J. at 557-58, 117 A.2d 889. The litigation privilege is not limited to statements made in a courtroom during a trial, but also extends to communications occurring preliminary to or in preparation for, proposed judicial and quasi-judicial proceedings. Hawkins v. Harris, supra, 141 N.J. at 216-18, 661 A.2d 284. The privilege applies to "`any communication (1) made in judicial and quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.'" Hawkins, supra, 141 N.J. at 216, 661 A.2d 284 (quoting Silberg v. Anderson, 50 Cal.3d 205, 266 Cal.Rptr. 638, 786 P.2d 365, 369 (1990).) Moreover, the privilege is not limited to statements made in a courtroom during a trial but, rather, "extends to all statements or communications in connection with the judicial proceeding." Ibid.; (internal citation omitted). Thus, provided the communication has a nexus with the litigation, it is privileged. Indeed, it covers statements made during settlement negotiations or while engaged in a private conference with an attorney regarding litigation. Ibid. Morever, the privilege applies to bar claims for tortious conduct other than defamation. Peterson v. Ballard, 292 N.J.Super. 575, 582, 679 A.2d 657 (App.Div.), certif. denied, 147 N.J. 260, 686 A.2d 761 (1996) (citing Rainier's Dairies, supra, 19 N.J. at 558, 117 A.2d 889).
We acknowledge defendants' argument that an employee must feel free to register concerns regarding workplace harassment; an EEO officer must be free to make a reasonable determination as to probable cause regarding complaints, and a union representative must be free to assist complainants in bringing their allegations to the attention of the appropriate authorities. Nevertheless, we conclude that plaintiff's allegations do not implicate the litigation privilege. While parties and participants have the utmost freedom to resort to litigation, and any communication made by them in connection with the litigation is privileged, the right to resort to litigation is not without some limitation.
Here, plaintiff does not seek to use statements made by defendants, or their representatives, during the course of the administrative proceedings to advance his civil cause of action. Rather, he contends that the litigation was improperly filed. We agree. While communications made in the course of litigation are *841 privileged, the privilege does not extend to the improper filing of a law suit. The litigation privilege is not absolute. For example, it does not insulate a litigant from liability for malicious prosecution, which is sometimes also referred to as malicious use of process. Rainier's, supra, 19 N.J. at 564-66, 117 A.2d 889; Baglini v. Lauletta, 338 N.J.Super. 282, 297, 768 A.2d 825 (App.Div.2001).[5]
We next consider defendants' contention that the trial court erred in denying summary judgment on plaintiff's common law claims for civil conspiracy, tortious interference, and intentional infliction of emotional distress because these claims were waived by plaintiff's assertion of a CEPA claim. We reject that contention. To be sure, by bringing a CEPA claim, a plaintiff waives "the rights and remedies available under any contract, collective bargaining agreement, State Law, rule or regulation under the common law." N.J.S.A. 34:19-8. However, defendants now concede that in light of the dismissal of the CEPA counts, continued maintenance of the common law torts is not barred by CEPA's waiver provisions. Ballinger v. Delaware River Port Auth., 311 N.J.Super. 317, 331-32, 709 A.2d 1336 (App.Div.1998) (no waiver on the basis of a claim filed against a bi-state agency that is not subject to CEPA); Crusco v. Oakland Care Ctr., Inc., 305 N.J.Super. 605, 612-13, 702 A.2d 1363 (App.Div.1997) (no waiver on the basis of time-barred CEPA claim).
We next consider defendants' contentions that the trial judge erred in denying their motion for summary judgment on the claim of intentional infliction of emotional distress. Summary judgment must be denied if the competent evidence submitted, when viewed in the light most favorable to the non-moving party, is sufficient to permit a rational factfinder to resolve the disputed factual issues in favor of the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). We assess defendants' contentions in that context. Moreover, on appeal, we apply the same standard that governs trial courts in determining whether summary judgment was properly granted. Graziano v. Grant, 326 N.J.Super. 328, 338, 741 A.2d 156 (App.Div.1999).
In order to establish a viable claim of intentional infliction of emotional distress, a plaintiff must prove: (1) that defendant acted intentionally or recklessly; (2) that defendant's conduct was extreme and outrageous; (3) that defendant's actions were the proximate cause of the plaintiff's distress; and (4) that the emotional distress suffered by the plaintiff was severe. Buckley v. Trenton Saving Fund Society, 111 N.J. 355, 366, 544 A.2d 857 (1988). The emotional distress suffered must be so severe that no reasonable person could be expected to endure it. Ibid. A severe and disabling emotional or mental condition which is capable of being generally recognized and diagnosed by *842 professionals trained to do so qualifies as severe emotional distress. Taylor v. Metzger, 152 N.J. 490, 515, 706 A.2d 685 (1998). Post-traumatic stress disorder may qualify as severe emotional distress. Ibid. In order for conduct to be extreme and outrageous, it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Buckley, supra, 111 N.J. at 366, 544 A.2d 857. Ibid. Here, when viewed in the light most favorable to plaintiffs, we conclude that a rational factfinder could determine that a four-person conspiracy to file false charges which were intended to, and could have cost plaintiff his livelihood and severely impacted his career, is sufficiently outrageous behavior so as to warrant submission of the issue to the jury for its determination.
In opposition to the motion, plaintiff submitted inter alia, a report from Dr. Pasahow, who concluded that plaintiff had been "severely traumatized, continued to experience generalized anxiety consisting of both moderate or frequent feelings of being insecure, tense, strained, ill at ease, upset, dissatisfied, frightened, lacking confidence, being nervous, jittery, indecisive, unable to relax, discontent, worried, confused, unpleasant, and ruminating over possible misfortunes." He found that plaintiff was experiencing a critical level of anxiety and experiencing a mild clinical depression. He diagnosed plaintiff as having suffered traumatic stress disorder. His report concluded as follows:
Mr. Hill will experience permanent psychological effects as a result of these false sexual harassment accusations. He will continue to avoid work situations where women can bring sexual harassment charges against him. This could lead to sub-par performance in work situations where one to one meetings need to be held. More importantly, this will restrict the type of jobs Mr. Hill will apply for over the years. He very much misses doing the clinical work with the children. His prior work had provided existential meaning for the death of his son. It was asking a lot for a man to come to terms with the meaningless death of a young son. However, the work Mr. Hill did with juveniles sublimated his grief over his son's death. His present work fails to provide that existential meaning. He will continue to experience anxious and depressed symptoms.
When that report is viewed in the light most favorable to plaintiff, as we must, we conclude that a rational factfinder could determine that plaintiff suffered severe emotional distress that no reasonable person could be expected to endure, and that defendants' conduct was a proximate cause of that distress.
Relying upon Picogna v. Board of Educ. of Tp. of Cherry Hill, 143 N.J. 391, 671 A.2d 1035 (1996), defendants contend that plaintiff is not entitled to recover for any emotional distress he may have suffered because it is litigation-induced distress, which may not be a separate component of damages. We reject that contention. To be sure, in Picogna, the Court held that a plaintiff may not recover for litigation-induced distress as a separate component of damages. Id. at 399, 671 A.2d 1035. However, the Court also noted that severe emotional distress proximately caused by defendants' conduct, exclusive of the litigation, is recoverable. Ibid. Here, plaintiff was not seeking recovery for severe emotional distress by virtue of the litigation itself. Rather, he was seeking recovery for the severe emotional distress he suffered as a result of defendants' conduct in conspiring to file false charges against him.
*843 We also reject defendants' contention that the judge failed to properly exercise his gatekeeping function by allowing the case to go to the jury since Peterson and Owens were merely exercising their right to complain of sexual harassment. They contend that submitting the case to the jury undermines New Jersey's strong public policy in favor of eradicating discrimination. We reject that contention. While it is extremely rare to find conduct that will rise to the level of outrageousness necessary to provide a basis of recovery against a complainant of sexual harassment for the tort of intentional infliction of emotional distress, for the reasons we have previously noted, we conclude that there was sufficient evidence in this case to warrant submission to the jury. Litigants have every right to file a complaint. However, they have no right to conspire to file a fabricated claim in an attempt to deprive a supervisor of his livelihood. Simply put, we conclude that the evidential material submitted by plaintiff in opposition to the motion was sufficient to meet the high threshold necessary to submit a claim for intentional infliction of emotional distress to a jury. The judge did not err in denying the motion for summary judgment.
We now turn to defendants' contention that the jury verdict on the conspiracy count is tainted by the improper admission into evidence of a statement allegedly made by Peterson. Significantly, defendants did not object at trial. Accordingly, this contention must be evaluated in the context of R. 2:10-2, the plain error rule. Thus, we may only reverse if we conclude that the statement was inadmissible, and that the admission of the statement into evidence was clearly capable of producing an unjust result. R. 2:10-2; Green v. New Jersey Mfrs. Ins. Co., 160 N.J. 480, 502, 734 A.2d 1147 (1999). The failure to object to the improper reception of evidence deprives the trial judge of an opportunity to take appropriate remedial action, by, at the very least, giving a curative instruction. State v. Douglas, 204 N.J.Super. 265, 274, 498 A.2d 364 (App. Div.1985), certif. denied, 102 N.J. 378, 508 A.2d 242 (1985), and 102 N.J. 393, 508 A.2d 253 (1986).
At trial, Hill testified that in November 1993, after the disciplinary hearing had been resolved in his favor, Peterson walked into his office crying and said "this was a lie, they put me up to it. Paul [Alexander] knew it was a lie but in order for me to keep my job, I had to say this and that Mr. Budd ... was there at the time of the meeting and he knew it was a lie." At trial, Peterson denied making that statement. The statement was not admissible under N.J.R.E. 803(b)(5), the co-conspirator rule. In order for a hearsay statement to be admissible under that rule, three distinct conditions must be met. State v. Phelps, 96 N.J. 500, 509, 476 A.2d 1199 (1984). "First, the statement must have been made in furtherance of the conspiracy. Second, the statement must have been made during the course of the conspiracy. Lastly, ... there must be evidence, independent of the hearsay, of the existence of the conspiracy and defendant's relationship to it." Id. at 509-10, 476 A.2d 1199 (internal citations omitted). Here, the statement was an admission to Hill, and was not in furtherance of the conspiracy. Moreover, it was not made during the course of the conspiracy. The conspiracy had ended. Hence, it was not admissible under N.J.R.E. 803(b)(5).
Clearly, under N.J.R.E. 803(c)(25), the statement was admissible against Peterson as a statement against her interest. That rule, provides as follows:
A statement which was at the time of its making so far contrary to the declarant's pecuniary, proprietary, or social interest, *844 or so far tended to subject declarant to civil or criminal liability or to render invalid declarant's claim against another, that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true....
[ N.J.R.E. 803(c)(25).]
Indeed, defendants concede that Peterson's statement was admissible against her. However, they contend that it was improperly admitted against Budd and Alexander. Budd and Alexander did not object to the testimony. Nor did they request the court to sanitize it, or redact references to Alexander and Budd. In the civil context, we have previously held that a statement by a juvenile that he had thrown his bicycle from the eighth-floor stairwell window of a housing complex owned by the Jersey City Housing Authority was admissible against the Housing Authority as an admission against interest under Evid. R. 63(10).[6]Speaks v. Housing Auth. of Jersey City, 193 N.J.Super. 405, 413, 474 A.2d 1081 (App.Div.), certif. den., 97 N.J. 655, 483 A.2d 177 (1984). Thus, we conclude there was not error, let alone plain error, in allowing the plaintiff to testify regarding Peterson's statement. Even if the statement was inadmissible hearsay, we conclude that its admission was not clearly capable of producing an unjust result. R. 2:10-2. After all, Peterson testified and denied making the statement. The admissibility of a statement under N.J.R.E. 803(c)(25) is not dependent upon the availability of the declarant. Thus, the statement is admissible, even though the declarant does not testify at trial. Here, however, Peterson did testify and denied making the statement. Accordingly, the jury had the opportunity to evaluate her credibility, as well as plaintiff's credibility, on the critical issue of whether the statement was made. We recognize the fact that Peterson testified does not render admissible, what might otherwise be inadmissible hearsay. We also recognize the jury did not have the opportunity to hear the alleged statement when made, nor, obviously, was Peterson subjected to cross-examination at the time of the alleged statement. However, we conclude that since the jury had the opportunity to hear, weigh, and evaluate the testimony of Peterson as well as plaintiff regarding the making of the statement, the error, if any, was not clearly capable of producing an unjust result. In addition, there was other evidence from which a jury could conclude that Alexander and Budd participated in a conspiracy with Owens and Peterson to falsely accuse plaintiff of sexual harassment. Indeed, the judge remarked when ruling upon defendants' motion for a new trial that he thought plaintiff was a much more credible witness than Peterson.
We next consider defendants' contention that the trial judge erred in denying their motion for a new trial in light of the prejudice which resulted when: (1) plaintiff's attorney improperly interjected the issue of race into the case; (2) plaintiff's attorney suggested, in his closing argument, that defendants had retaliated against V.P. for giving statements in support of plaintiff's case; and (3) the trial judge incorrectly admitted prior bad act evidence regarding Peterson. We find these contentions to be without sufficient merit to warrant extended discussion in a written opinion. R. 2:11-3(1)(E). We add the following comments and observations.
A trial judge may only grant a motion for a new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, *845 it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). This standard applies whether the motion is based upon a contention that the verdict was against the weight of the evidence, or is based upon a contention that the judge's initial trial rulings resulted in prejudice to a party. Crawn v. Campo, 136 N.J. 494, 510-12, 643 A.2d 600 (1994). Whether to grant the motion is within the trial court's discretion. Id. at 511, 643 A.2d 600. On appeal, we consider essentially the same standard. R. 2:10-1. Moreover, we must accord deference to the trial court's conclusion regarding the prejudice, if any, attributable to the erroneously admitted evidence, if the judge agrees that evidence was improperly admitted. Crawn, supra, 136 N.J. at 512, 643 A.2d 600. In addition, we must give deference to the judge's determination of the extent to which the prejudice, if any, may have contributed to an unjust result. Ibid.
At trial, plaintiff's attorney cross-examined Alexander regarding a statement he made at deposition that plaintiff's conduct was so outrageous that castration might be the appropriate punishment. It was also brought out that he said that the comment was facetious. Counsel continued his cross-examination in an effort to establish that castration had racial connotations. Alexander's attorney did not object. Ultimately, the cross-examination became argumentative and was stopped by the judge.
The next morning Alexander's attorney moved for mistrial, arguing that there was no race issue in the case and that plaintiff's counsel had attempted to turn Alexander's "castration" comment into a racial comment simply to inflame the passions of the jury. The judge reserved on the motion, struck the testimony, and gave an appropriate and strong curative instruction.[7] While it may have been improper for plaintiff to inject the issue of race, we conclude that the judge acted appropriately and forcefully in stopping the cross-examination when it became argumentative and gave a strong curative instruction. The judge was in the best position to gauge the potential for prejudice, and we conclude that he did not mistakenly exercise his discretion in denying defendants' motion for a new trial on this basis.
Defendants also contend that the trial judge erred in allowing prior bad act evidence. Prior to trial, defense counsel moved to exclude all testimony regarding allegations of embezzlement which preceded Peterson's departure from the Bridgeton School system. After hearing oral argument, the judge ruled that the evidence was admissible to establish Peterson's state of mind and her motive for acting against plaintiff.
Pursuant to N.J.R.E. 404(b), "[E]vidence of other crimes, wrongs or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive ... intent ... when such matters are relevant to a material issue in dispute." Our Supreme Court has held that such evidence may be admitted provided it meets the following test:
1. The evidence of the other crime [or wrong] must be admissible as relevant to a material issue;
2. It must be similar in kind and reasonably close in time to the offense [or wrong] charged;

*846 3. The evidence of the other crime [or wrong] must be clear and convincing; and
4. The probative value of the evidence must not be outweighed by its apparent prejudice.
[State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992).]
When motive is to be shown through other-crime evidence, the second Cofield factor is not relevant since similarity between the alleged act and the one for which defendant is on trial is not a requirement for admissibility. State v. Collier, 316 N.J.Super. 181, 194, 719 A.2d 1276 (App.Div.1998), aff'd o.b., 162 N.J. 27, 738 A.2d 369 (1999).
The admissibility of other-crime or bad-act evidence offered pursuant to N.J.R.E. 404(b) is committed to the sound discretion of the trial judge. State v. Marrero, 148 N.J. 469, 483, 691 A.2d 293 (1997). If the other-crime or bad-act evidence is admitted, the trial judge must give the jury a carefully crafted, limiting instruction, "to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere." State v. Stevens, 115 N.J. 289, 304, 558 A.2d 833 (1989).
The judge did not mistakenly exercise his discretion in allowing the evidence. We conclude that the evidence was properly admitted in an effort by plaintiff to establish Peterson's motive in filing a false charge against plaintiff in order to salvage her career. The evidence was that she had resigned from her position in Bridgeton not in order to relocate as a result of her divorce, but, rather because of an investigation into allegations that she had embezzled funds from the Parents Teachers' Association. There was evidence introduced during the trial from which the jury could have inferred that Peterson was extremely concerned about losing her employment at Manor Woods. Thus, the evidence was relevant and lent support to plaintiff's theory that Peterson maliciously filed false charges against him as an act of self-preservation in order to keep her job at all costs.
When the judge denied the pre-trial motion to exclude the evidence, he noted that he intended to provide a limiting instruction at trial. While it is true that no limiting instruction was given after Peterson testified, it cannot be ignored that a strong, forceful limiting instruction was given immediately after plaintiff first raised the matter of Peterson's false representations during his own testimony. While it would have been advisable for the judge to give the limiting instruction on each occasion, any error in failing to do so is harmless since it was not clearly capable of producing an unjust result.
We next consider plaintiffs' contention raised in their cross-appeal that the trial judge erred in granting summary judgment dismissing their complaint against the State of New Jersey, Department of Corrections, and Local 1038, based upon his conclusion that these defendants could not be vicariously liable for the acts of their agents because those acts were not within the scope of their employment. In considering whether an employer is vicariously liable for the acts of its employees or agents, the fact that the tort is negligent or intentional is of no real consequence. Schultz v. Roman Catholic Archdiocese of Newark, 95 N.J. 530, 535, n. 1, 472 A.2d 531 (1984). Under the doctrine of respondeat superior, an employer will be held liable to a third party even for the intentional torts of one of its employees if that employee was acting within the scope of *847 his or her employment. Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 416, 650 A.2d 958 (1994); Lehmann v. Toys `R' Us, 132 N.J. 587, 619, 626 A.2d 445 (1993). An employee is acting within the scope of employment if the action is, of the kind [that the servant] is employed to perform; it occurs substantially within the authorized time and space limits; [and] it is actuated at least in part, by a purpose to serve the master. Abbamont, supra, 138 N.J. at 416, 650 A.2d 958, (citing DiCosala v. Kay, 91 N.J. 159, 169, 450 A.2d 508 (1982) (internal citations omitted)). Thus, the doctrine of respondeat superior is not limited to negligent torts. An employer may be held liable for the intentional torts of his servant when they are "reasonably connected with the employment and so within its `scope.'" Abbamont, supra, 138 N.J. at 419, 650 A.2d 958 (citing W. Prosser, et al., Cases and Materials Torts, 685 (7th ed.1982)).
Here, when considered in the light most favorable to plaintiff, as we are obliged to do, it is clear that he presented a genuine issue regarding the material fact as to whether Owens, Peterson, Budd, or Alexander were acting within the scope of their employment. Thus, summary judgment was improperly granted. R. 4:46-2(c); Brill, supra, 142 N.J. at 540, 666 A.2d 146. As previously noted, in determining whether the acts were within the scope of the servants' employment, the factfinder must consider whether they were of the kind the servant is employed to perform; occurred substantially within the authorized time and space limits; and were actuated, at least in part, by a purpose to serve the master. Abbamont, supra, 138 N.J. at 416, 650 A.2d 958. However, we also note that the conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master. Restatement (Second) of Agency § 228 (1957). Other factors to be considered are whether the conduct is of the same general nature as that authorized, or incidental to the conduct authorized; whether the master has reason to expect that such an act will be done; the similarity in quality of the act done to the act authorized; and the extent of departure from the normal method of accomplishing an authorized result. Restatement (Second) of Agency § 229 (1957).
In Abbamont, the Court held that the trial judge erred in setting aside the verdict against the employer. In our view, the Court did not hold that the employer was liable as a matter of law for the torts of its employees under the circumstances there presented. Rather, implicit in the Court's decision was its belief that a jury question was presented and the judge erred in setting aside the jury verdict. In light of our conclusion that a genuine factual issue existed as to whether Budd, Peterson and Alexander were acting within the scope of their employment, we reverse the grant of summary judgment on the issue of vicarious liability, and remand for a new trial limited to that issue.
We recognize that DOC and Local 1038 did not participate in the trial and therefore did not offer any evidence regarding the acts or liability of Budd, Peterson and Alexander, their agents. In addition, we acknowledge that they did not offer any evidence or participate in the trial regarding the damages sustained by plaintiff. Arguably, on remand they should be entitled to be heard on those issues. However, by this opinion we have affirmed judgment in favor of plaintiffs against Budd, Peterson and Alexander. In addition, we have found no error regarding the damages awarded. Thus, under the circumstances *848 here presented, we conclude that it would be unfair and unjust to require plaintiff to relitigate those issues in light of our conclusion that the jury verdict should stand. After all, if DOC and Local 1038 find themselves on the horns of a dilemma, it is of their own making. They sought and received summary judgment on the issue of liability. We have concluded that they were not entitled to summary judgment. Thus, we conclude it would be inappropriate to require plaintiff to relitigate those issues particularly where, as previously noted, the same attorney represented Budd, Peterson and DOC, and another attorney represented both Alexander and Local 1038.
In essence, the interests of the principal and the agent were the same regarding the liability of Budd, Peterson and Alexander. Each attorney was seeking to convince the jury that the agents were not liable. In addition, each were seeking to limit plaintiff's damages. See Pappas v. Santiago, 66 N.J. 140, 144-45, 329 A.2d 337 (1974) (holding in a bifurcated trial in which separate trials were held on issues of liability and damages, that a defendant driver whose negligence was found not to be a proximate cause of the accident is bound by the award of damages to plaintiff at trial even though he did not participate in the damages trial when, on appeal, the judgment in favor of the driver on liability is reversed for a new trial). See also Corridon v. City of Bayonne, 129 N.J.Super. 393, 398, 324 A.2d 42 (App.Div. 1974) (holding that where the issue requiring reversal is fairly separable from the other issues involved in this matter, and where the best interest of justice will be served by granting a partial new trial, an appellate court may set aside only so much of the judgment as is infected by the error and preserve the balance). See also Leslie Blau Co. v. Alfieri, 157 N.J.Super. 173, 202, 384 A.2d 859 (App.Div.1978) (holding reversal of summary judgment dismissing cross-claim for indemnification does not necessitate a new trial on all issues; the cross-claim was allowed to be tried independently). Here, while the issues of the liability of the DOC and Local 1038, as well as the damages, may not be fairly separable from the other issues involved, for the reasons previously noted, we elect to limit the retrial to the issue of vicarious liability.
For guidance of the parties on remand, we note that we are troubled by the fact that Budd, Peterson, the State of New Jersey, and Department of Corrections are all represented by the same attorney. Likewise, Alexander and Local 1038 are represented by one attorney. Moreover, all defendants have filed a joint brief. We perceive the interests of Peterson and Budd to be, to some extent, adverse to the interest of the State of New Jersey and Department of Corrections regarding the issue of vicarious liability. Likewise, we consider the interest of Alexander, to some extent, to be adverse to the interest of Local 1038 on that same issue. Notwithstanding the potential conflict, the defendants all ask that we affirm the grant of summary judgment. In effect, Budd, Peterson and Alexander urge that they were not acting within the scope of their employment and, therefore, the judge correctly held that their masters cannot be vicariously responsible for their actions. We are concerned whether they made an informed decision to take that position which appears to be adverse to their best interest.
In a somewhat related context, our Supreme Court has expressed a concern for potential conflicts in cases involving civil rights actions filed under 42 U.S.C. § 1983 against governmental entities and individual government officials or *849 employees. Petition for Review of Opinion 552, 102 N.J. 194, 198, 507 A.2d 233 (1986). The Court noted that if the claims asserted against individuals "could subject them to personal liability without a right of indemnification, the conflict is real, rather than potential." Id. at 201, 507 A.2d 233. Thus, joint representation of multiple parties whose interests are potentially diverse is permissible only if "there is a substantial identity of interests between them in terms of defending the claims that have been brought against all defendants. The elements of mutuality must preponderate over the elements of incompatibility." Id. at 204, 507 A.2d 233 (internal citations omitted). Thus, on remand, the judge must explore on the record whether there is an actual conflict of interests, or the realistic possibility of such a conflict. If there is a conflict that outweighs the mutuality or similarity of the interests among the defendants, separate representation must be arranged. Id. at 208-09, 507 A.2d 233.
We have carefully considered all the contentions raised by the parties, together with the briefs filed, the argument of counsel, and the applicable law, and to the extent we may have not have specifically mentioned them in this opinion, we have concluded that they are without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E). Since the effect of our decision is to affirm the judgment entered in favor of plaintiff, and since he cannot recover under his common law claims and CEPA, we have elected not to consider his contention that the trial judge erred in dismissing his CEPA claim.
Affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion.
NOTES
[1] Antoinette Hill sued per quod. All references to plaintiff individually shall be to Frank Hill.
[2] Owens never appeared, and a default was entered against her.
[3] C.L. testified and denied having a sexual relationship with Owens.
[4] Budd was aware of the fact that a complaint had been drafted on behalf of Owens and Peterson.
[5] We recognize that plaintiff may be circumventing the special grievance requirement by not pleading that cause of action. Griffin v. Tops Appliance City, 337 N.J.Super. 15, 24, 766 A.2d 292 (App.Div.2001); Aly v. Garcia, 333 N.J.Super. 195, 204, 754 A.2d 1232 (App. Div.2000), certif. den., 167 N.J. 87, 769 A.2d 1050 (2001). However, that issue was not raised by defendants on appeal and we elect not to consider it sua sponte. Moreover, while we acknowledge that we have previously held that mental anguish or emotional distress arising from the filing of administrative charges does not constitute a special grievance, Brien v. Lomazow, 227 N.J.Super. 288, 303-04, 547 A.2d 318 (App.Div.1988), we observe the extent of the mental or emotional distress suffered by plaintiff under the facts here presented, coupled with the purpose of the conspiracy, may have presented a jury question as to whether plaintiff suffered a special grievance.
[6] Evid. R. 63(10) was the precursor to N.J.R.E. 803(c)(25).
[7] We note that Alexander's version at depositions was somewhat different. There, he said he may have had a discussion with Peterson in which castration was discussed as the appropriate punishment.