**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0540-17T3

ERZSEBET MISKOLCZI-TOROK,

    Plaintiff-Appellant,

v.

CHRISTOPHER J. BUMP, D.C.,

    Defendant-Respondent,

and

MICHAEL T. GRANO, D.C.,

    Defendant.

_____

Argued November 13, 2018 – Decided January 10, 2019

Before Judges Fasciale and Rose.

On appeal from Superior Court of New Jersey, Sussex County, Law Division, Docket No. L-0190-15.

G. Martin Meyers argued the cause for appellant (Law Offices of G. Martin Meyers, PC, attorneys; G. Martin Meyers, on the briefs).

Law Office of Jeffrey Randolph, LLC, attorneys for respondent (Jeffrey Randolph, on the brief).

PER CURIAM

In this professional chiropractic malpractice action, plaintiff Erzsebet Miskolczi-Torok appeals from a May 11, 2017 judgment of no cause of action following a jury verdict in favor of defendant Christopher J. Bump, D.C,[1] and a September 15, 2017 order denying her motion for a new trial. The trial occurred over two weeks at which multiple witnesses testified, including four doctors. The jury found that Dr. Bump did not deviate from accepted standards of care in the chiropractic industry. Consequently, the jury did not reach issues of causation or damages.[2]

Before he treated her, Dr. Bump gave plaintiff a health history form, which required that she detail her history of any illnesses. It is undisputed that

---

[1] Before the trial started, plaintiff voluntarily dismissed her claim against defendant Michael Grano, D.C. without any settlement payment. Plaintiff had filed an amended complaint against Dr. Grano, a chiropractor who treated plaintiff's back before she met Dr. Bump. In her amended complaint, plaintiff alleged that she returned to Dr. Grano after she stopped treating with Dr. Bump, Dr. Grano exacerbated her back problems, and that Dr. Grano had treated her after Dr. Bump without her consent. As a result, she abandoned those allegations. Dr. Grano testified at the trial.

[2] The jury also rejected plaintiff's claim that Dr. Bump lacked informed consent to treat her.

A-0540-17T3

in response to that request, plaintiff did not tell Dr. Bump about her prior back injuries. Plaintiff primarily argues that in summation, defense counsel implied plaintiff was at fault for failing to disclose that information. The parties ultimately agreed that a comparative negligence charge was legally and factually unwarranted. As such, plaintiff's purported "fault" for failing to provide a complete health history was not for the jury's consideration. Plaintiff contends, however, that the judge erred by failing to instruct the jury how they should consider the summation comments, which were brief.[3]

Dr. Bump's counsel did not imply that plaintiff was negligent for failing to tell Dr. Bump about her prior back problems. Rather, he used plaintiff's omissions as further evidence that plaintiff was on a "mission" to setup Dr. Bump for this lawsuit, to impeach her credibility, and to demonstrate that Dr. Bump did not cause plaintiff's alleged injuries. Before summations, plaintiff's counsel informed the judge that he, too, intended to use plaintiff's undisputed failure to disclose her back problems by arguing to the jury that Dr. Bump deviated from accepted standards by himself failing to obtain a complete medical history from plaintiff.

---

[3] In the early part of the trial, Dr. Bump's counsel requested a comparative negligence charge, but later withdrew that request after reviewing the governing law and testimony.

A-0540-17T3

We conclude Dr. Bump's counsel's fleeting comments responded correctly to plaintiff's summation argument to the jury, i.e., that Dr. Bump failed to obtain a full medical history, and were in direct response to evidence plaintiff introduced during the trial. The jury charge as a whole correctly applied that governing law. We therefore affirm.

I.

We begin by recognizing that our scope of review of the trial court's decision whether to grant a new trial is narrow. It is well settled that "[a] motion for a new trial is addressed to the sound discretion of the trial court." Baumann v. Marinaro, 95 N.J. 380, 389 (1984); see also Hill v. N.J. Dep't of Corrs., 342 N.J. Super. 273, 302 (App. Div. 2001). The grant or denial of a motion for a new trial should not be disturbed on appeal unless that discretion has been abused. Hill, 342 N.J. Super. at 302; see also R. 2:10-1 (A court's ruling on a new trial motion shall not be reversed "unless it clearly appears that there was a miscarriage of justice under the law.").

We review the denial of a motion for new trial using the same standard as the trial judge. Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011). Thus, we can reverse such a decision only where "it clearly and convincingly appears that there was a miscarriage of justice under the law." R.

A-0540-17T3

4:49-1(a).  Although we must make our own determination of whether the jury's verdict resulted in a miscarriage of justice, we do not write on a clean slate.  See Dolson v. Anastasia, 55 N.J. 2, 7 (1969).  Instead, we rely heavily on the trial judge's "feel of the case," that is, the trial judge's "personal observations of all of the players . . . ." Jastram ex rel. Jastram v. Kruse, 197 N.J. 216, 230 (2008) (recognizing the trial judge "sees and hears the witnesses and the attorneys, and . . . has a first-hand opportunity to assess their believability and their effect on the jury").  Jury verdicts "should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice."  Risko, 206 N.J. at 521 (citation omitted).

II.

We view the evidence in a light most favorable to Dr. Bump as the party opposing the new trial motion. See Caldwell v. Haynes, 136 N.J. 422, 432 (1994).

Between November 2013 and March 2014, plaintiff sought nutritional counseling from Dr. Bump, a licensed chiropractor and dietitian.  During her initial appointment, which took approximately two hours, Dr. Bump asked

5

plaintiff to complete medical questionnaires, including a health history form, which provided in pertinent part:

> In order for Dr. Bump to evaluate your current health, we ask that you <u>provide a past history of any illness</u> you <u>may</u> have had. <u>Please be as detailed as possible</u>. This list should be in chronological order stating the nature of the illness and [your] approximate age. If you were treated for this illness, please state how.
>
> [Emphasis added.]

Plaintiff took the form home, completed it, and returned it during her next appointment. On the form, plaintiff disclosed she had an appendix removal at age eight; tonsil removal at age three or four; lymph node removal at age fifteen; ovarian cyst removal at age twenty and twenty-six; gastritis between the ages of thirty-five and thirty-nine; nasal surgery at age thirty-eight; and sinus infections from 2010 up to "the present." It is undisputed that plaintiff received chiropractic treatment for back trouble, including a bulging disc, from 2007 to 2009. Even though she admitted on cross-examination that Dr. Grano treated her back on twenty visits, and that she had been experiencing "extreme" pain "all the time," she omitted her prior back medical illnesses. Dr. Bump testified on direct-examination that the first visit was a "get-to-know the plaintiff session and an examination."

6

At the next visit, Dr. Bump reviewed "in great detail" a medical metabolic work-up that he had done. After that, he made various treatment recommendations and discussed them with plaintiff, for which he obtained her consent. Up to this point, Dr. Bump had not manipulated plaintiff's spine or performed any chiropractic adjustments.

The next visit was unscheduled and occurred immediately after she received emergency room treatment for stomach pain in January 2014. Plaintiff returned to defendant in "a lot of distress" complaining of "very acute severe gastritis," which he described as "stomach intestinal pain." Dr. Bump palpated her abdomen and spine. His examination revealed a "very inflamed tender spot in the mid-dorsal spine." Dr. Bump diagnosed this as subluxation and suggested, in addition to "other [treatment] for her gastrointestinal distress, "that she undergo "an adjustment" to her spine.

The doctor detailed on direct examination the chiropractic adjustment procedure he employed on the third visit. He explained that he had plaintiff wrap her arms in front and hold her shoulders. Dr. Bump then "put [his] arm behind [plaintiff's] back and guide[d] [her arms]." He explained he did not use a "forceful kind-of thrusting motion." The doctor said that this procedure was intended to "open up" her spine, and that he had had done this "thousands and

thousands of time[s]" in the past, and that there were no associated risks. Dr. Bump said that he uses Sacro-Occipital and Cox flexion distraction techniques. He explained that these techniques are "gentle," which he considered a holistic health model. Dr. Bump described it as a "very gentle procedure whereby you just use the weight of the patient . . . [i]t's a very effortless procedure." After this treatment, plaintiff left without any problems.

The following month, Dr. Bump gave plaintiff nutritional counseling, and made a similar low-force adjustment to the same area of her back. Plaintiff surreptitiously recorded this visit "just in case . . . to make sure he wo[uld not] deny he adjust[ed her] a month before and if it turn[ed] out anything serious or permanent [she] wanted to make sure he never denie[d] it." According to plaintiff:

> [She] knew hundred, a million percent he did something wrong because [she regretted] that moment because until then [she] just ha[d] groin pain and shooting butt pain into [her] body but that time after the second adjustment the pain just [shot] down all of the way down to [her] toes and ever since never goes away.

In March 2014, plaintiff returned to Dr. Bump's office. On direct examination, she testified that she did so "with kind of like a mission to . . . tape him" and have him "admit[] he did those adjustments to [her.]" Plaintiff conceded at trial

8

that she was on a mission to gather evidence, essentially against Dr. Bump in this case.

After treating with Dr. Bump, plaintiff returned to Dr. Grano. In April 2014, Dr. Grano used a DRX 9000 machine and performed decompression treatment. Plaintiff characterized this experience as "disastrous traction treatment." She claimed that she was unable to stand, called 9-1-1, arrived at the hospital, and used a walker for ten days. The hospital discharged her with lumbar strains and sprains.

The trial evidence demonstrated that plaintiff had a long-standing history of back pain, since at least 2007. For example, Dr. Grano explained that at that time, he had used a decompression machine for her thoracic pain, even though the machine he used was designed for lumbar treatment. He said plaintiff decided to receive that treatment because she feared "surgery [would be] her only . . . option." At trial, plaintiff characterized her pain during that time as "huge." And Dr. Grano's records reflected plaintiff's pain as ten out of ten, 100 percent of the time. She also treated with two other chiropractors over the years, who adjusted her thoracic and lumbar spine. She never told Dr. Bump about any of this.

Dr. Bump's counsel withdrew his request for a comparative negligence charge because it was inapplicable. The question, related to her failure to disclose her prior back issues, always had been primarily whether Dr. Bump deviated from accepted standards by not following up on the medical history that plaintiff gave him. The question was never whether plaintiff somehow caused her own injuries by allowing Dr. Bump to treat her while withholding from him a complete history of her back trouble. Nevertheless, plaintiff's counsel sought a limiting jury instruction pursuant to Hofstrom v. Share, 295 N.J. Super. 186 (App. Div. 1996), which unlike here, is a case involving a patient who failed to follow a doctor's post-treatment instructions. Hofstrom had argued that her failure to follow the instructions was irrelevant. Id. at 192-93. Citing Johansen v. Makita U.S.A., Inc., 128 N.J. 86 (1992), we held the trial judge had erred when he refused to instruct the jury that the plaintiff's comparative negligence was irrelevant because, importantly, the defendant's counsel repeatedly stressed plaintiff's comparative negligence throughout the trial. Id. at 193. Hofstrom is a completely different case than ours. Dr. Bump's counsel did not stress, let alone argue, that plaintiff was negligent, and defendant's counsel never argued plaintiff failed to follow post-treatment instructions.

The judge correctly distinguished <u>Hofstrom</u> and did not give a limiting charge. The judge recounted Dr. Bump's testimony and found plaintiff's counsel initially "brought up the issue of the [medical] questionnaire" on cross-examination of Dr. Bump, twice inquiring whether the form contained a "single question of history for treatment or pain of the spine." Unlike <u>Hofstrom</u>, where the defendant's counsel introduced plaintiff's negligence as "a major theme," the judge found that Dr. Bump's counsel made no such claim here.

After the jury returned its verdict, plaintiff filed a motion for a new trial. Plaintiff renewed her claim that the judge erred by failing to provide a limiting instruction. Plaintiff argued, in the alternative, the verdict sheet should have contained an allocation of fault in case the jury found "to some degree she was responsible for that failure." The judge denied the motion. In pertinent part, he stated that:

> In this matter, defendant did not request a comparative fault charge, did not request that the verdict sheet contain a comparative fault question, and did not make the theme of the case about the patient questionnaire. To the contrary, the defense maintained all along that plaintiff . . . had credibility issues and highlighted those issues and plaintiff's testimony about being, "on a mission," to the jury. There were also critical contradictions by . . . plaintiff that were highlighted by . . . defendant during plaintiff's testimony and closing arguments.

11

A-0540-17T3

Plaintiff's counsel raised the issue of the questionnaire with respect to defendant's conduct. Specifically, plaintiff's counsel focused on the fact that the questionnaire lacked a section dealing with prior back or spine issues.

The [c]ourt highlighted this questioning on May 9[], 2017 during its first decision dealing with the requests for a corrective charge. The [c]ourt went through CourtSmart to listen to the questioning related to the questionnaire.

. . . .

Unlike in Hofstrom, where the plaintiff's alleged failure to follow discharge instructions was relevant to the case, the issue of the medical history and whether defendant took a proper medical history goes directly to whether defendant violated a standard of care as a chiropractor. The issue was highlighted by plaintiff with [her] expert to again demonstrate that . . . defendant violated a standard of care.

Further, it was not a focus of the defense with respect to the questionnaire issue. Plaintiff highlighted the issue during closing arguments.

. . . .

. . . [The judge concluded] the questionnaire issues all go to whether defendant violated his standard of care. There was no evidence submitted in this trial to support plaintiff's argument that the lack of a proper history in the questionnaire was the fault of . . . plaintiff.

A-0540-17T3

## III.

We conclude there is no basis to disturb the jury's verdict. In denying plaintiff's motion for a new trial, we see no error, let alone that the verdict was "a miscarriage of justice under the law." R. 4:49-1(a). There was no reason to give the jury a limiting instruction or include a separate question on the verdict sheet addressing comparative negligence.

Unlike the defense attorney in Hofstrom, Dr. Bump's counsel did not stress (or even argue) plaintiff's comparative fault throughout the trial. Rather, the omission of plaintiff's prior back issues from Dr. Bump's health history questionnaire was relevant to whether Dr. Bump should have followed up with plaintiff, in addition to plaintiff's credibility and proximate cause. In their summations, counsel properly commented about that evidence in that regard. See Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999) (indicating that "[c]ounsel may argue from the evidence any conclusion which a jury is free to reach"); Diakamopoulos v. Monmouth Med. Ctr., 312 N.J. Super. 20, 32 (App. Div. 1998) (stating that "[c]ounsel is to be given 'broad latitude' in summation but 'comment must be restrained within the facts shown or reasonably suggested by the evidence adduced'").

A-0540-17T3

As to causation, plaintiff had a physically challenging job as a dancer and massage therapist. She told Dr. Grano seven years before treating with Dr. Bump that she feared surgery was her only answer. Her pain at that time was constant. Five years before she sought treatment with Dr. Bump, Dr. Grano's records reflect plaintiff was "desperate" and that she was seeking her "last hope." Indeed, she tried the DRX machine for her thoracic spine even though she knew it was for treatment of the lumbar spine. Notably, plaintiff admitted that after she stopped seeing Dr. Bump, Dr. Grano's treatment of her was "disastrous."[4]

As to credibility, Dr. Bump's counsel, referencing plaintiff's own testimony, stressed plaintiff was on a "mission" to sue Dr. Bump, recording her sessions with Dr. Bump, and "gathering evidence for a case against [him as] part of the setup." Failing to raise her prior back problems, secretly taping Dr. Bump's treatment of her, and her failed subsequent treatment by Dr. Grano, evidence that plaintiff introduced on her case in chief, was fair game for impeachment purposes.

Moreover, plaintiff's counsel cross-examined Dr. Bump about plaintiff's omission of her prior back issues from the questionnaire. He raised the subject

---

[4] Dr. Bump's counsel made other arguments on causation too, such as plaintiff's alleged injuries were unrelated to the adjustment to her mid-back area.

A-0540-17T3

to demonstrate that Dr. Bump failed to obtain a full medical history before he treated plaintiff. Dr. Bump's counsel dealt head-on with that subject by briefly cross-examining plaintiff's expert asking pointed, but brief, questions in response to the expert's direct testimony that Dr. Bump did not take any history of plaintiff.

> QUESTION: Okay. But will you agree with me there was a very, very detailed history about nutrition and other aspects of the patient's life?
>
> ANSWER: That's fine but that has nothing to do with structural examination or history. That's right.
>
> QUESTION: Would you also agree with me there were sections in that intake [questionnaire] where the patient was asked to provide a history of illness why [she] came to see the doctor?
>
> ANSWER: Yes.
>
> QUESTION: And that was blank, right?
>
> ANSWER: Some parts were but she put in there her main complaint was yeast, hair loss, you know, a couple of other things, but they were all non-related to spinal or musculoskeletal issues.
>
> QUESTION: Okay. Would you agree with me that the plaintiff did not disclose to Dr. Bump in those intake forms she saw Dr. Grano back in 2007-2008?
>
> ANSWER: She didn't say anything about that, no.

A-0540-17T3

QUESTION: Okay. She didn't disclose that she had ten out of ten back pain back in . . . 2007-2008, right?

ANSWER: No, she didn't because at the time she went to see this doctor she had no complaints in the thoracic spine. . . .

As part of plaintiff's motion for a new trial, plaintiff's counsel argued in the alternative that the verdict sheet should have contained an allocation of plaintiff's fault in case the jury found "to some degree she was responsible for that failure." Doing so would have diluted the jury's consideration of Dr. Bump's duty. Importantly, however, at the charge conference (before his motion for a new trial where he asked alternatively for a special verdict question to evaluate comparative negligence), plaintiff's counsel maintained that "there's no legal basis for imposing . . . that responsibility on [plaintiff]." At that conference, plaintiff's counsel asked the judge to charge the jury that "there is no legal basis or factual basis in this case . . . [to] base an assessment that [plaintiff] was required to disclose [her prior back problems] unless she was specifically asked [for that information]." Therefore, there was no basis to include a question on the verdict sheet about plaintiff's comparative negligence.

Instead, the final jury instructions tracked the model jury charge for medical malpractice cases. Pertinent to this appeal, the charge addressed whether Dr. Bump deviated from the accepted standards of care in the

chiropractic industry. The judge explained that the experts furnished opinions about those standards.

According to plaintiff's expert, and applicable to the issues on appeal, minimum accepted standards required Dr. Bump to perform a "proper and thorough physical examination" and obtain a full medical history, using the questionnaire as a starting point. Dr. Bump's expert testified that there is no requirement, under the facts of this case, that a doctor perform a full evaluation before adjusting a patient's spine. His expert then elaborated on how Dr. Bump complied with the accepted standards when he adjusted plaintiff's spine, i.e., by discussing the adjustment with plaintiff and by adhering to the proper procedure for performing the anterior adjustment.

Finally, plaintiff urges us to declare on broad public policy grounds that a doctor's reliance on a medical questionnaire for prior illnesses does not obviate a healthcare provider's obligation to obtain a patient's full medical history. Developing public policy of the State of New Jersey is best left to the other two branches of government. See e.g., In re Declaratory Judgment Actions, 446 N.J. Super. 259, 286 (App. Div. 2016); State v. Saavedra, 433 N.J. Super. 501, 525 (App. Div. 2013).

A-0540-17T3

To the extent we have not addressed plaintiff's remaining claims, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0540-17T3