**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2221-15T4

LOYLE, LLC and ELYOL, INC.,
t/a LOYLE LANES BOWLING CENTER,

    Plaintiffs-Respondents,

v.

GREATER NEW YORK MUTUAL
INSURANCE COMPANY,

    Defendant-Respondent,

and

BROUWER, HANSEN & IZDEBSKI
ASSOCIATES, and JOHN H. IZDEBSKI,
INC.,

    Defendants/Third-Party
    Plaintiffs-Appellants,

v.

GREATER NEW YORK MUTUAL
INSURANCE COMPANY,

    Third-Party Defendant-
    Respondent.

_____

        Argued December 20, 2016 - Decided  September 5, 2017

        Before Judges Ostrer, Leone and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Docket No. L-0669-11.

Patricia M. Henrich argued the cause for appellants (Reilly, Janiczek, McDevitt, Henrich & Cholden, P.C., attorneys; Ms. Henrich and Michelle B. Cappuccio, on the briefs).

Michael R. Perle and Raffi Momjian argued the cause for respondents Loyle, LLC and Elyol, Inc. (Raffi Momjian PC, attorneys; Mr. Perle, of counsel; Mr. Perle and Mr. Momjian, on the brief).

Allan Maitlin argued the cause for respondent Greater New York Mutual Insurance Company (Sachs, Maitlin, Fleming & Greene, attorneys; Mr. Maitlin, of counsel; Mr. Maitlin and Christopher Klabonski, on the brief).

PER CURIAM

Following a 2010 arson fire that destroyed the bowling alley they owned and operated, plaintiffs discovered they were underinsured for the property and business interruption losses they sustained.

In this action, plaintiffs claimed their insurance broker, defendant Brouwer, Hansen & Izdebski, Inc. (BHI), negligently advised them concerning the insurance coverage limits required to replace the bowling alley building and its contents in the event of a total loss and to reimburse plaintiffs for losses due to business interruption. The matter proceeded to trial and the

jury agreed, resulting in the entry of a $1,998,808.77 judgment against BHI.[1]

On appeal, BHI claims the trial court erred by: permitting plaintiffs to introduce testimony and evidence based on two documents that were not produced during discovery, and denying BHI's mistrial motion and motion for a new trial based on the admission of such testimony and evidence; granting plaintiffs' in limine motion to bar application of comparative negligence; granting the insurance carrier's motion for summary judgment; determining the judgment credits to which BHI was entitled; and misinforming the jury about the burden of proof. Based on our review of the record, we are not persuaded by BHI's contentions and affirm.

## I.

### A.    Background

On January 11, 2010, an arson fire destroyed Loyle Lanes Bowling Center (the bowling center), resulting in a total loss of the building and its contents. At the time of the fire, the

---

[1] The jury found plaintiffs' losses from the destruction of the bowling alley were $6,840,000. The $1,998,808.77 damage award against BHI represents plaintiffs' net loss after deducting credits based on plaintiffs' receipt of payments from their insurance carrier and monies from other parties. The calculation of judgment credits is one of the issues on appeal discussed later.

bowling center was insured under a policy with Greater New York Mutual Insurance Company (GNY) that became effective on April 1, 2009 (2009 policy). The policy provided replacement cost coverage for the building with a limit of $3,425,000, replacement cost coverage for the building's contents with a limit of $200,000, and business interruption coverage with a limit of $400,000.

An appraisal conducted after the fire, however, revealed that the building's actual replacement cost was $6,395,247.32, and the replacement costs of the contents exceeded the policy limits. GNY paid plaintiffs the full payment of the coverage limits under the policy, together with adjustments, for a total of $4,070,000.

### Plaintiffs and GNY Enter Into a Litigation Agreement

In March 2011, plaintiffs entered into an agreement (litigation agreement) with GNY to pursue litigation related to the losses resulting from the fire. The litigation agreement states that "GNY [] paid [plaintiffs] the full amount of its coverages" under plaintiffs' policy, which, after adjustments, totaled $4,070,000, but that "losses in excess of the GNY policy limits" remained. Plaintiffs and GNY agreed to sue "any and all persons or entities that may be responsible for causing or contributing to the fire loss."

The litigation agreement provided that GNY would "institute suit on behalf of itself by way of subrogation," and that plaintiffs would institute separate litigation "to recover monies for the damages sustained . . . in excess of the amounts paid by GNY." GNY agreed to incur all litigation costs and that any recoveries, "whether by way of settlement or judgment, with respect to the lawsuit brought by GNY . . . [would] be shared equally between [plaintiffs] and GNY." Plaintiffs and GNY agreed that plaintiffs would retain all monies they recovered in their malpractice action against BHI.

### The Lawsuits Filed by Plaintiffs and GNY, and BHI's Third-Party Complaint Against GNY

In July 2011, GNY filed suit asserting subrogation rights for plaintiffs' losses against the individuals alleged to have set the fire and their employers,[2] as well as Steven L. Holt, Safe & Sound Security and Telecommunication (Safe & Sound), and S.S. Sprinkler Co. (S.S. Sprinkler).[3] The former provided security alarm system services and the latter provided the sprinkler system for the bowling center.

---

[2] It was determined the fire was set by individuals affiliated with a competitor of the bowling center, and those individuals were criminally prosecuted.

[3] The complaint was filed in the name of Strathmore Insurance Company, an affiliate of GNY.

Plaintiffs filed a separate complaint alleging insurance broker malpractice against BHI, claiming BHI negligently advised plaintiffs concerning the amount of insurance required to provide replacement cost coverage for a complete loss of the bowling center building and its contents and, as a result, plaintiffs' 2009 policy had grossly deficient coverage. Plaintiffs also asserted negligence claims against Safe & Sound and S.S. Sprinkler.

BHI answered plaintiffs' complaint, generally denying the allegations and asserting affirmative defenses and cross-claims against its codefendants for contribution and indemnification. In March 2012, the court granted BHI's motion to consolidate plaintiffs' and GNY's cases.

A month later, plaintiffs and GNY released their respective claims against Safe & Sound and S.S. Sprinkler. Plaintiffs and GNY each received $500,000 from Safe & Sound and $450,000 from S.S. Sprinkler. Safe & Sound and S.S. Sprinkler were dismissed from the consolidated lawsuits.

Two years later, in April 2014, BHI was granted leave to file a third-party complaint against GNY for indemnification and contribution. BHI alleged GNY was obligated under an agency agreement to indemnify BHI from any civil liability arising out of GNY's negligence "in processing or handling business placed

by [BHI] with GNY." BHI also alleged GNY conducted annual inspections to determine the appropriate replacement cost coverage limits for the bowling center building, that GNY had a duty to establish adequate annual policy limits, and that GNY breached its duty by undervaluing the full replacement costs of the building.

On May 16, 2014, plaintiffs amended their complaint adding negligence claims against GNY and dismissing their claims against all of the remaining defendants except BHI. Plaintiffs subsequently dismissed their claims against GNY.

### The Court Grants Summary Judgment and Dismisses BHI's Third-Party Complaint Against GNY

GNY filed a summary judgment motion seeking dismissal of BHI's third-party complaint. On August 14, 2015, the motion court issued a detailed written decision and entered an order granting GNY's motion for summary judgment and dismissing BHI's third-party complaint with prejudice. The court found GNY had neither a contractual nor a common law duty to establish coverage limits sufficient for the full replacement costs for the bowling center, or to indemnify BHI for its negligence.

### Plaintiffs' Negligence Claim Against BHI — Pretrial Rulings

As a result of the court's dismissal of BHI's third-party complaint against GNY, the only remaining claim for trial was

plaintiffs' insurance malpractice claim against BHI. In advance of trial, plaintiffs moved to bar BHI from presenting evidence of comparative negligence against plaintiffs, arguing BHI waived the defense by failing to plead it in its answer. BHI admitted it failed to plead comparative negligence but argued plaintiffs were on notice it would pursue a comparative negligence defense based on BHI's answers to interrogatories and expert reports.

The trial court found BHI waived the right to pursue a comparative negligence defense by failing to raise it in its pleadings in accordance with <u>Rule</u> 4:5-4. The court rejected BHI's argument that plaintiffs were on notice that comparative negligence would be at issue. However, the court ruled that BHI could present evidence showing plaintiffs had "the best knowledge and ability to determine [policy] limits" as relevant to proximate causation.

BHI also moved in limine for an order permitting it to introduce evidence showing plaintiffs received $4,070,000 from GNY, and plaintiffs and GNY received a total of $1,900,000 from Safe & Sound and S.S. Sprinkler. Plaintiffs were entitled to the replacement costs under the policy only if they undertook to

rebuild the bowling center.[4] BHI sought to introduce evidence showing plaintiffs received settlement funds and could afford to rebuild the bowling center but opted not to do so. Plaintiffs intended to introduce evidence showing that because of BHI's negligence, they received insurance proceeds that were insufficient to fund the rebuilding of the bowling center.

The court granted BHI's motion to introduce evidence showing the funds plaintiffs received from GNY and the other tortfeasors but denied BHI's request to inform the jury about the $950,000 GNY received from by Safe & Sound and S.S. Sprinkler.

B. The Trial

The record developed at trial showed that brothers Charles and John Loyle opened the bowling center in 1970. Charles,[5] John, and the Loyle family, including Charles's son, Michael, operated the bowling center thereafter.

---

[4] Under the GNY policy, plaintiffs were entitled to receive replacement costs if they rebuilt the bowling center, and only actual costs if they did not rebuild. Generally, the amount of actual costs would be less than replacement costs because actual costs are calculated based on the actual cost of the building and contents less applicable amounts for depreciation. On the other hand, replacement costs are calculated on the cost of replacing the building and its contents following a loss.

[5] Because this case involves multiple members of the Loyle family, we use first names for ease of reference. We intend no disrespect in doing so.

A BHI employee, broker David Stanton, sold plaintiffs the 2009 policy. In their complaint, plaintiffs alleged that BHI, through Stanton, negligently provided erroneous advice that the 2009 policy limits were sufficient to cover the full replacement cost of the bowling center building and its contents in the event of a total loss.

Although plaintiffs' negligence claim is founded on the lack of sufficient insurance coverage under the 2009 policy, the parties presented evidence at trial concerning the GNY policies plaintiffs purchased through Stanton and BHI from 1998 to 2009. Many of BHI's arguments on appeal are premised on the court's rulings concerning evidence about the 1998 policy, and we therefore summarize the testimony and evidence pertinent to the judge's rulings concerning evidence of the 1998 policy that are challenged on appeal.

Charles's Testimony and the 1998 Notes

Charles was the first witness to testify at trial. He explained his interactions with Stanton concerning plaintiffs' first purchase of a GNY policy in 1998. The policy was effective April 1, 1998 to April 1, 1999, and provided replacement cost coverage for the building with a limit of $2,300,000, personal property insurance that covered the building's contents with a limit of $200,000, and business interruption insurance with a

limit of $400,000.

Charles testified that after purchasing the 1998 policy, plaintiffs obtained an appraisal of the bowling center from the Thompson-Loyle Company, Inc., a company owned in part by his nephew. The appraisal was memorialized in a report that estimated the bowling center's building and contents replacement costs to be $3,650,000.

Charles was asked if he provided Stanton with a copy of the Thompson-Loyle appraisal report. Charles responded that based on his "internal notes," he believed he gave Stanton a copy of the report during a September 1998 meeting. Charles then said, "I checked my notes this morning." BHI's counsel objected, arguing plaintiffs had not produced any notes concerning the September 1998 meeting during discovery and that Charles should not be permitted to rely upon whatever notes he reviewed to refresh his recollection about the meeting.

The court conducted an N.J.R.E. 104 hearing concerning the late production of the 1998 notes. Charles, then eighty-eight years old, testified that the 1998 notes were salvaged from the fire and kept at his residence. He could not recall if he had sent the 1998 notes to BHI's counsel. Plaintiffs' counsel represented that the notes were not previously provided to him.

Charles stated he had other records with him in court that

A-2221-15T4

he reviewed prior to his testimony. He also said he had additional records at his home that he reviewed in anticipation of testifying. The court adjourned the proceedings to permit counsel's review of the records Charles had in court and to permit Charles to retrieve and provide counsel with the other records from his home. All of the notes and records were provided to counsel that day.

The next day, after reviewing the notes and records, BHI's counsel requested that Charles be precluded from referring to or testifying about two notes concerning his 1998 meetings with Stanton. Counsel also requested that the jury be instructed to disregard Charles's testimony from the previous day about the notes. BHI argued the failure to produce the notes during discovery prejudiced BHI because their production during trial constituted unfair surprise, impacted counsel's trial strategy including her opening statement, and improperly bolstered Charles's credibility.

The court overruled BHI's objection and determined that based on Charles's testimony at the N.J.R.E. 104 hearing, Charles did not intend "to deceive" anyone by failing to produce the 1998 notes, and plaintiffs' reliance on the 1998 notes would not "substantial[ly] change . . . the theory of the case." The court concluded that any prejudice to BHI could be remedied by

permitting counsel to take Charles's deposition.

The court rejected BHI's request to depose Michael Loyle, but Michael was in court, and provided sworn testimony outside the presence of the jury that he never saw the notes prior to trial. There was no evidence Michael was present during the September 1998 meeting between Charles and Stanton. The court also initially denied BHI's request to re-depose plaintiffs' expert William C. Stewart, Jr. concerning the notes. The trial was paused and BHI's counsel took Charles's deposition concerning the notes that day.

The trial resumed and Charles testified that the 1998 notes refreshed his recollection about conversations he had with Stanton concerning plaintiffs' first GNY policy. Based on the information contained in the first note, Charles testified that he met with Stanton in September 1998 and provided Stanton with the Thompson-Loyle appraisal report, which estimated the insurable value of the bowling center building was $2,160,415, and the replacement cost of equipment was $1,540,000, for a total insurable value of $3,650,000 after adjustments.

Charles testified that the note concerning the September 1998 meeting refreshed his recollection that he gave Stanton a copy of the appraisal, but that Stanton calculated a replacement cost for the building at $2,145,750, based on an estimated cost

of $75 per square foot multiplied by the 28,610 square footage of the center.[6] Stanton also estimated the replacement value of the equipment was $960,000, based on a calculation of $30,000 for each of the center's thirty-two bowling lanes. According to Charles, the equipment valuation was rounded up to $1,000,000, and therefore Stanton's total replacement cost valuation for the building and its contents was $3,145,750. Stanton applied an eighty-percent coinsurance factor[7] to the total valuation, which

---

[6] The building valuation Charles attributes to Stanton was only $15,000 less than the valuation of the building in the Thompson-Loyle appraisal report. Approximately $485,000 of the $500,000 difference between the appraisal and Stanton's valuation is attributable to the values assigned by each to replacement costs for the building's contents.

[7] As later explained by plaintiffs' expert, William C. Stewart, Jr., coinsurance rates require an insured to carry a policy limit equal to or above a specified percentage of the total replacement value of the property insured. A failure to carry a policy limit at the required percentage results in a penalty to an insured for a claim for less than a total loss. For example, where an eighty-percent coinsurance rate applies and a property is worth $200,000, the insurance policy must have a limit of at least $160,000 for the insured to collect 100 percent of any partial loss from the insurer. If the insured carries only a $120,000 limit, and suffers a $10,000 loss, the insurance company pays the insured only $7500 because $120,000 is only three-quarters of $160,000. The remaining $2500 of the loss would be borne by the insured because the policy limit was not eighty percent of the property's replacement value. The amount of the coinsurance percentage is not directly an issue in this case because there was a total loss. However, an accurate valuation of the replacement cost of the insured property is essential to ensure that after the coinsurance rate is applied, the insured can collect 100 percent for a partial loss claim.

resulted in an insurance requirement of $2,516,600, and Stanton recommended that Charles purchase insurance with a $2,700,000 limit. Charles asked Stanton to forward a letter recommending an increase in the coverage from plaintiffs' then-current coverage of $2,300,000 to $2,700,000, but he never received the letter.

Charles also testified concerning a second note he used to refresh his recollection that on October 1, 1998, he received a notice changing the policy limits to $2,800,000, instead of the $2,700,000 he had discussed with Stanton. He called Stanton's office and left a message requesting that Stanton send a letter recommending an increase in the coverage to the $2,800,000 amount in the notice.

Thus, the GNY policy plaintiffs first purchased through BHI in April 1998 was amended effective November 1998 to increase the building coverage from $2,300,000 to $2,800,000. The amended policy did not, however, alter the $200,000 coverage limit for the building's contents and the $400,000 coverage limit for business income.

Charles testified to matters beyond those based on the 1998 notes. He explained the GNY insurance policy was thereafter renewed annually through Stanton and BHI until the fire occurred in 2010. According to Charles, each March plaintiffs and Stanton discussed the annual policy renewal. Charles stated the initial

15

"[$]2,800,000 [building] coverage existed for three years," following 1998, then increased to $3,120,000 for the policy period of April 1, 2002 to April 1, 2003.

In March 2003, plaintiffs transferred $537,000 in bowling equipment from Loyle, LLC, to Elyol, Inc.[8] Charles drafted a letter to Stanton dated March 20, 2003, explaining the equipment transfer and asking if the contents coverage should be increased from $200,000 to $600,000. Before Charles had a chance to mail the letter, Stanton visited the bowling center and the parties discussed the issue.

During their March 2003 meeting, Charles again took notes memorializing his conversation with Stanton.[9] Charles testified that according to his March 2003 notes, Stanton advised Charles there was no need to increase the contents coverage based on the equipment transfer. Stanton explained that all of the bowling equipment was considered part of the building and therefore was covered under the building coverage.

Following the March 2003 meeting, plaintiffs renewed their insurance coverage for the April 1, 2003 to April 1, 2004 policy

---

[8] Charles explained that Loyle, LLC owned the bowling center real estate and Elyol, Inc. was the bowling center's operating company.

[9] The March 2003 notes were produced in discovery and were not the subject of any objections at trial.

period. The building coverage limit was increased to $3,425,000, but the $200,000 coverage limit for the building's contents and the $400,000 coverage limit for business income remained the same. Following the changes to the 2003 policy, none of the coverage limits were adjusted during any of the subsequent annual policy renewals preceding the 2010 fire.

In 2008, plaintiffs invested $431,000 in renovations to the bowling center. Michael testified that in March 2009, he showed Stanton the renovations and asked if they needed more insurance. According to Michael, Stanton said no additional insurance was required because the renovations simply replaced existing fixtures in the bowling center. Michael explained that he relied on Stanton's advice because Stanton was the insurance expert.

Plaintiffs' Expert

Plaintiffs presented the testimony of William C. Stewart, Jr., an expert on insurance producer and broker conduct. During voir dire, Stewart explained that he reviewed the transcript of Charles's mid-trial deposition. BHI's counsel objected to Stewart testifying concerning the 1998 notes or Charles's deposition testimony, arguing that the court did not allow her to re-depose Stewart after Charles disclosed the existence of the notes, and that any opinion Stewart might have about the notes would constitute an unfair surprise. The court excused the

A-2221-15T4

jury to conduct an N.J.R.E. 104 hearing.

Stewart testified during the hearing that based on his review of the 1998 notes, he believed Stanton wrongfully discounted the Loyle-Thompson appraisal valuing the building at "3.6 million" in favor of his personal appraisal of "2.7 million." Stewart noted that Stanton is not a licensed appraiser. He opined:

> [I]t was incorrect advice for [] Stanton to recommend [$]2.7 million in coverage because if you accepted the $3.6 million appraisal, [eighty] percent . . . would have been [$]2.88 million. . . . Stanton was, therefore, recommending underinsurance and a coinsurance penalty because the property would have not been insured to [eighty] percent of its value.

The court ruled BHI's counsel could use Stewart's N.J.R.E. 104 hearing testimony during her cross-examination of Stewart. The judge also offered BHI's counsel the opportunity to depose Stewart at plaintiffs' cost. BHI chose not to depose Stewart, and the trial resumed.

Stewart's trial testimony concerning the 1998 notes was consistent with his N.J.R.E. 104 hearing testimony. He opined that Stanton's recommendation that plaintiffs increase building coverage to $2,700,000 was at odds with the Thompson-Loyle appraisal valuation of the building at $3,650,000, and resulted in coverage insufficient to satisfy GNY's eighty percent

18

coinsurance requirement. He stated that the 1998 amended policy raising the insurance coverage from $2,300,000 to $2,800,000 did not satisfy the eighty percent coinsurance requirement. On cross-examination, Stewart admitted that the 1998 notes did not specify that Stanton actually "recommended" anything.

Stewart testified concerning Stanton's advice to Charles during the parties' March 2003 meeting. He opined that Stanton's advice that plaintiffs did not need to increase their contents coverage from $200,000 to $600,000, despite plaintiffs' $537,000 equipment transfer, was "absolutely incorrect." Stewart explained that Stanton should have considered how long the $200,000 contents limit had been in effect, whether plaintiffs purchased any new equipment, and reassessed the replacement value of the bowling center's contents.

Stewart also opined as to the sufficiency of Stanton's advice to plaintiffs in 2008 and 2009. He testified that Stanton failed to properly advise plaintiffs in 2008, when GNY increased its coinsurance requirement from eighty to ninety percent. Stewart believed Stanton should have recommended that plaintiffs obtain an appraisal due to the coinsurance increase and because the building coverage had been the same since 2004.

Stewart also testified that Stanton erred in March 2009 by advising Michael that plaintiffs did not require additional

19

insurance coverage as a result of the 2008 renovations. Stewart admitted it was not the job of a licensed insurance broker to determine the replacement value of a building, but testified that if a client asks a broker whether more insurance is needed, the broker "has an obligation to give an accurate answer because . . . he's inviting reliance on his answer." Here, however, Stewart observed that Stanton did not ascertain which items included in the 2008 renovations were permanently affixed to the structure and thus considered part of the building, and which were moveable and thus considered contents under the policy.

Stewart also pointed to Stanton's failure to request the costs of the renovations. Stewart testified that if Stanton was unaware of the costs, he could have recommended plaintiffs consult with "somebody qualified to appraise" the bowling equipment, and then evaluated their coverage needs. Stewart had no evidence Stanton took such action.

<u>BHI's Mistrial Motion</u>

Following Stewart's testimony, BHI moved for a mistrial, arguing BHI was prejudiced by the introduction of Charles's 1998 notes that were not provided during discovery, and that the prejudice was compounded by the fact that counsel was not permitted to re-depose Michael or Stewart. The court denied the motion, reiterating that Charles did not intentionally withhold

the 1998 notes, and that any potential prejudice was ameliorated because counsel had been permitted to depose Charles about the notes, question Michael and Stewart outside of the presence of the jury, and because BHI was permitted to depose Stewart but opted not to do so. The court also noted it had ruled that BHI's expert would be permitted to offer opinions based on the 1998 notes, and Charles's and Stewart's testimony about them, during the expert's testimony on BHI's behalf.

### Stanton's Deposition Testimony

Plaintiffs read portions of Stanton's deposition transcript to the jury including his recollection of the March 2009 discussion with Michael about the 2008 renovations. Stanton testified the renovations consisted of replacements of "like quality equipment with like quality equipment," that was "already covered in [plaintiffs' policy] building limit." Stanton informed Michael "it was not necessary to add to the building coverage at that time."

The jury also heard Stanton's deposition testimony explaining his understanding of "replacement coverage." Stanton was asked during his deposition "if one of your insured had $100,000 coverage on the building and the loss is . . . $150,000[,] and has a replacement coverage in the policy, does the insured receive $150,000 or . . . $100,000?" Stanton

replied: "[T]hey would receive the $150,000." Other evidence at trial showed Stanton's understanding was incorrect.

### Testimony of GNY's Underwriter, Phillip Wu

Plaintiffs called Philip Wu, a GNY employee and underwriter for plaintiffs' 2009 GNY policy to testify that GNY conducted an annual physical inspection of the bowling center and, based on the inspection, entered data into a computer program called Marshall-Swift, which calculated the replacement value of the bowling center building. GNY used the Marshall-Swift analysis to determine the policy limits and the policy premium for its internal use. The report was not shared with brokers and the reports for the bowling center were not provided to BHI.

Wu explained that GNY would not permit an insured to purchase a policy with building replacement cost coverage limits less than the amount calculated by the Marshall-Swift analysis. However, if an insured showed that the replacement value was more than the value generated by the Marshall-Swift analysis, the insured could purchase insurance with a higher limit by paying a higher premium. Based on the 2009 Marshall-Swift analysis, Wu used a replacement cost of $3,306,000 to calculate plaintiffs' insurance premium for the building coverage.

### Stanton's Trial Testimony

Stanton testified as a defense witness. He has been an

22

insurance broker since 1993, specializing in the field of bowling alleys. He corrected his deposition testimony concerning the meaning of "replacement cost," explaining he confused "replacement cost" and "guaranteed replacement cost," and stated he never told plaintiffs they could recover more from GNY than their policy limit.

Stanton testified that over the course of his business relationship with plaintiffs, they never wanted the building coverage limit increased or expressed dissatisfaction with the contents coverage limits. Stanton did not believe plaintiffs ever wanted additional coverage because they were concerned about the amount of their premiums.

Stanton was questioned about the Thompson-Loyle appraisal report. He denied that Charles provided him with the report in 1998 or that they even met that year to discuss increasing coverage. He also denied giving Charles a replacement cost estimate of $2,700,000. On cross-examination, however, Stanton stated he was "sure" and "guess[ed]" a meeting occurred in September 1998. He admitted he had no reason to believe Charles's 1998 notes were inaccurate and stated that the second note accurately documented that Charles received a November 4, 1998 endorsement increasing the policy limits to $2,800,000.

Stanton was also questioned about his March 2003 meeting

with Charles. Stanton initially testified that he had no memory of a March 2003 meeting or if Charles asked if the bowling center should increase its business contents coverage based on its $537,000 equipment transfer. However, Stanton admitted on cross-examination that the March 2003 meeting occurred and that he advised plaintiffs the equipment transfer did not constitute a change in the building's contents necessitating an increase in the policy limits.

Stanton further testified that he could not recall if he advised plaintiffs that between 2008 and 2009, GNY increased the coinsurance requirement on plaintiffs' policy from eighty to ninety percent but stated that in any event, the change was reflected "in the document." On cross-examination, Stanton stated he did not discuss the significance of the increase with plaintiffs.

Stanton testified that in 2009, Michael showed him the renovations that were made to the bowling center, but he denied that Michael asked about an increase in coverage and that he advised Michael not to buy more insurance. On cross-examination, however, Stanton admitted that Michael asked him whether the renovations warranted an insurance increase, and that he told Michael the renovations were merely replacement costs that were already "figured into the building [coverage] rate."

24

Stanton also explained that he did not propose increasing the building coverage for the April 1, 2009 to April 1, 2010, policy year based on GNY's analysis and valuation of the building. When asked why he did not propose an increase when the coinsurance rate increased from eighty to ninety percent, he replied, "I just relied on [GNY's] value." Stanton acknowledged that the GNY policy contained a provision stating that its reports and inspections were for GNY's internal purposes only. He also acknowledged that GNY did not conduct an inspection of the building for the 2009 policy until May 2009, yet he submitted that year's policy proposal to plaintiffs in March 2009 and the policy, with unchanged coverage limits, was renewed and became effective in April 2009.

BHI's Expert James R. Klagholz

James R. Klagholz testified as BHI's expert in the profession of insurance brokers and producers. He opined that in BHI's dealing with plaintiffs, its actions were consistent with the customary standards of care in the industry. He explained that it is not the job of an insurance broker to calculate the actual replacement value of buildings, personal property, or lost income. According to Klagholz, brokers are simply not qualified to determine appropriate policy limits.

Klagholz testified the 1998 Thompson-Loyle appraisal report

25

demonstrated plaintiffs were aware that a certified real estate appraiser had inspected their building and estimated its replacement cost as $3,650,000. He pointed out that Charles resisted increasing the building coverage from $3,120,155 to $3,425,000 for the period April 1, 2003 to April 1, 2004. He opined that Charles's 2003 notes demonstrated that Charles was not willing to purchase additional insurance coverage even when it was suggested.

Klagholz testified that Stanton's advice to Michael during their 2009 meeting was correct because plaintiffs had a replacement cost policy; that coinsurance had absolutely no applicability to plaintiffs' fire losses because plaintiff's suffered a total loss; and that it was reasonable for Stanton to rely on GNY's valuation in determining the building's replacement cost value. Klagholz concluded that neither BHI nor Stanton did anything incorrect in the sale of the 2009 GNY policy to plaintiffs.

On cross-examination, Klagholz agreed it would be improper for an insurance broker to do an independent calculation of a building and its contents replacement cost to make a recommendation for insurance coverage limits. He explained that if a client asks a broker if insurance coverage limits should be raised, the broker should not advise the client the coverage is

26

adequate but should instead advise the client that the broker is not qualified to calculate the value of a client's assets.

The Verdict

The jury returned a verdict finding BHI negligent, and that BHI's negligence proximately caused plaintiffs' damages. The jury found plaintiffs' total loss from the fire was $6,840,000, representing the sum of its findings as to building loss ($5,600,000), business interruption ($750,000), and contents loss ($490,000). The court molded the verdict by deducting the sums paid by GNY under the policy ($4,070,000), and the amounts recovered by plaintiffs from Safe & Sound and S.S. Sprinkler ($950,000) from the amount of plaintiffs' total loss ($6,840,000) for a damage award of $1,820,000. The court also awarded $178,808.77 in prejudgment interest and costs for a total judgment of $1,998,808.77.

BHI's New Trial Motion

BHI moved for a new trial, claiming the admission of the 1998 notes and Charles's corresponding testimony deprived BHI of a fair trial. The court issued a detailed written opinion and entered an order denying BHI's motion, finding there was sufficient evidence to support the jury's determination, and that the jury "evidently resolved the conflicting accounts of the incident between Charles [] and Stanton by crediting

[p]laintiffs' version, which was corroborated by trial testimony and other statements."

The court acknowledged that Charles's 1998 notes contradicted Stanton's trial testimony and likely affected his credibility, but described the notes as "one of the numerous evidential considerations" utilized by the jury to determine credibility. The court also found the notes "did not involve a wholesale-change in the presentation of [p]laintiffs' version of the incident," and "did not deviate significantly from pre-trial deposition testimony." Moreover, the court concluded it took sufficient remedial measures in response to the late production of the notes to ensure BHI received a fair trial.

## II.

BHI first argues the court erred by permitting the introduction of Charles's undisclosed 1998 notes memorializing his September 1998 meeting with Stanton and allowing testimony based on the notes. BHI contends the notes were integral and material and, therefore, their late production caused prejudice that could not be remedied. The notes, BHI argues, were the "smoking gun" that altered the entire trial. We are not persuaded.

BHI challenged the admissibility of the notes and corresponding testimony in different contexts during the trial.

First, BHI objected to both Charles and Stewart's testimony concerning the notes.[10] Second, BHI sought relief in the form of a mistrial motion and motion for a new trial based on the admission of testimony about the notes. We address the objections and motions in turn.

A.    BHI's Objections to Testimony and Evidence About Charles's 1998 Notes

BHI argues the court erred by permitting Charles to refresh his recollection based on the 1998 notes and testimony concerning the notes. BHI contends the court compounded its error by permitting Stewart to supplement the opinion contained in his expert report by testifying about the notes and expanding his opinion based on the notes.

"When a party fails to comply with discovery, the trial court, in its discretion, may impose appropriate sanctions." Allis-Chalmers Corp. Prop. Liab. Tr. v. Liberty Mut. Ins. Co., 305 N.J. Super. 550, 557 (App. Div. 1997). "The application of sanctions is consigned to the sound discretion of the court." Brown v. Mortimer, 100 N.J. Super. 395, 401 (App. Div. 1968).

We have recognized that "[p]reclusion of evidence as a

---

[10]  BHI did not challenge the authenticity of the notes, the admissibility of the notes had they been timely produced in discovery, or Charles's right to testify about the 1998 conversations with Stanton without reference to the notes.

sanction for failure to provide notice or make required disclosures is available '<u>in the limited circumstances where a lesser sanction is not sufficient to remedy the problem</u> caused by an inexcusable delay . . . thereby resulting in substantial prejudice to the non-disclosed party.'" <u>Manorcare Health Servs., Inc. v. Osmose Wood Preserving, Inc.</u>, 336 <u>N.J. Super.</u> 218, 235 (App. Div. 2001) (emphasis added) (quoting <u>Mitchell v. Procini</u>, 331 <u>N.J. Super.</u> 445, 453-54 (App. Div. 2000)).

In exercising its discretion, the trial court's chosen "sanction must be just and reasonable." <u>Lindenmuth v. Holden</u>, 296 <u>N.J. Super.</u> 42, 52 (App. Div. 1996), <u>certif. denied</u>, 149 <u>N.J.</u> 34 (1997). The court can suspend the imposition of sanctions "(1) where there is an absence of a design to mislead; (2) where there is an absence of the element of surprise if the evidence is admitted; and (3) where there is an absence of prejudice which would result from the admission of the evidence." <u>Ibid.</u>; <u>see also</u> <u>Manorcare</u>, <u>supra</u>, 336 <u>N.J. Super.</u> at 235 (suggesting lesser sanctions may be adequate to remedy surprise).

These standards apply whether the surprise evidence is proffered through the form of lay or expert witness testimony. <u>See</u> <u>State v. Wolfe</u>, 431 <u>N.J. Super.</u> 356, 363 (App. Div. 2013), <u>certif. denied</u>, 217 <u>N.J.</u> 285 (2014). The trial court's decision

to exclude or admit expert testimony on a subject not covered in the written report must "stand unless so wide of the mark that it results in a manifest denial of justice." Bitsko v. Main Pharmacy, Inc., 289 N.J. Super. 267, 284 (App. Div. 1996).

Based on our careful review of the record, we discern no basis to conclude the court abused its discretion in allowing Charles and Stewart to testify concerning Charles's 1998 notes and allowing introduction of the notes into evidence. Faced with plaintiffs' failure to produce the notes during discovery, the court immediately conducted an N.J.R.E. 104 hearing to determine why the notes had not been produced during discovery and the appropriate remedy for the failure.

The record supports the court's determination following the hearing that Charles's failure to produce the notes during discovery was not the result of any design to mislead, and BHI agreed.[11] The court, however, recognized that the existence of the notes and Charles's intended reliance on them constituted a surprise for BHI. In order to ameliorate any prejudice from the surprise, the court permitted BHI to take Charles's deposition.

---

[11] After hearing testimony from Charles, the court found there was "probably . . . no intention to deceive," and offered BHI's counsel the opportunity to cross-examine Charles on the issue. BHI declined and stated, "I don't have any reason to believe that [Charles] was intending to deceive anybody."

BHI was permitted to question Charles concerning the notes prior to continuing Charles's direct testimony. Charles was the first witness, his revelation concerning the notes came early in his testimony, and his deposition afforded BHI ample time to address the testimony and the notes on cross-examination. BHI was thereafter well-positioned to address the testimony and evidence with all subsequent witnesses at trial.

BHI contends that the opportunity to depose Charles during the trial could not remedy the prejudice from the late production of the notes because the notes changed plaintiffs' theory of the case. BHI argues it was prejudiced because prior to the discovery of the notes, plaintiffs' theory was that Stanton and BHI were negligent by never recommending that plaintiffs obtain an appraisal report to determine the replacement value of the building and its contents. BHI asserts that after the notes were discovered, plaintiffs' theory was that Stanton was negligent by making his own calculation of the value of the building and contents.

As correctly determined by the trial court, the record does not support BHI's contentions. Although Charles's 1998 conversations with Stanton provided context for the ensuing annual renewals of the policy, the jury's verdict was based on a determination that Stanton was negligent eleven years later in

2009. Plaintiffs' theory of negligence was that Stanton never requested an appraisal in connection with the 2009 policy renewal and that he was negligent in advising plaintiffs they did not need increased coverage based on their improvements to the bowling center. That theory never changed. Charles's notes concerning the 1998 policy did not alter plaintiffs' theory of BHI's negligence concerning the insurance coverage limits in the 2009 policy, which was the policy at issue in the litigation.

Moreover, the evidence showed that the policy limits were increased in 2003 based on conversations between Charles and Stanton that were wholly unrelated to the 1998 notes. Charles's notes concerning the 2003 conversations, that were timely produced during discovery, supported plaintiffs' consistent theory that Stanton was negligent in advising them there was no need for changes in the policy limits. The evidence also showed, without reference to the 1998 notes, that Stanton never advised plaintiffs about the 2008 increase in the coinsurance and otherwise provided erroneous advise about coverage limits at the time the 2009 policy was purchased.

Charles's testimony concerning the 1998 notes did not alter plaintiffs' theory of the case or surprise BHI in a manner requiring the exclusion of the evidence. This case does not resemble the cases cited by BHI where exclusion was required.

See, e.g., <u>McKenney v. Jersey City Med. Ctr.</u>, 167 <u>N.J.</u> 359, 369-76 (2001) (finding the court abused its discretion in denying a mistrial motion where defense counsel withheld disclosure of expert's intention to deviate from his earlier opinion and elicited the testimony after the plaintiff's case-in-chief); <u>Wymbs v. Twp. of Wayne</u>, 163 <u>N.J.</u> 523, 545-46 (2000) (reversing the admission of defendant's surprise expert witness produced twelve days into trial, who opined on a pivotal issue in the case regarding the scene of an accident); <u>Thomas v. Toys "R" Us, Inc.</u>, 282 <u>N.J. Super.</u> 569, 580-82 (App. Div.) (concluding the trial court properly excluded expert's references to x-ray films plaintiff discovered on the day of trial in part because it left defendant unable to rebut the evidence with his own expert), <u>certif. denied</u>, 142 <u>N.J.</u> 574 (1995).

We are therefore convinced that although BHI was surprised by the production of the notes, it did not suffer any prejudice that was not ameliorated by the court's curative measures of requiring production of the notes and allowing BHI's counsel to depose Charles.

The court was not required to sanction plaintiffs by barring the testimony and evidence, and did not abuse its discretion in permitting the testimony and evidence after BHI deposed Charles. The court struck a balance and alleviated any

34

prejudice to BHI by allowing its counsel to depose Charles before resuming trial. <u>See, e.g.</u>, <u>Gaido v. Weiser</u>, 227 <u>N.J. Super.</u> 175, 192 (App. Div. 1998) (finding exclusion of expert testimony not contained in the expert's report was not required where the court permitted the expert's deposition at trial and the testimony expanded upon the parties' defense, but did not assert an unexpected defense), <u>aff'd</u>, 115 <u>N.J.</u> 310 (1989).

For substantially the same reasons, we find the court took sufficient measures to eliminate potential prejudice concerning Stewart's expert testimony based on the 1998 notes. The court again paused the trial in order to ascertain Stewart's intended testimony outside the presence of the jury at an <u>N.J.R.E.</u> 104 hearing. At the hearing, Stewart explained that based upon the 1998 notes "as well as the [Thompson-Loyle] appraisal [report]," Stanton incorrectly performed a valuation of the property and its contents. Stewart further testified that Stanton was not a licensed appraiser and he incorrectly advised plaintiffs to obtain $2,700,000 in building coverage, an amount that "did not satisfy GNY's minimum [eighty percent coinsurance] requirement." The court stated that BHI's counsel could cross-examine Stewart with his <u>N.J.R.E.</u> 104 hearing testimony, and offered BHI's counsel the opportunity to depose Stewart, which counsel elected not to pursue. We discern no abuse of discretion in the trial

court's chosen remedial measures because Stewart's testimony concerning the 1998 notes did not change his ultimate opinion that BHI grossly underinsured the bowling center based on Stanton's erroneous and careless advice about the 2009 policy. See ibid.

Stewart's opinion at trial was primarily based upon Stanton's failure to discuss with plaintiffs the impact of GNY's increase of its coinsurance rate before renewing the policy in 2008, and his response to Michael's inquiries in 2009 about whether the insurance limits should be increased. Stewart was deposed on three occasions but was only asked about the parties' 1998 meeting at his first deposition, where he opined that BHI should have advised plaintiffs to have the property appraised before underwriting the 1998 policy.

During his subsequent depositions, however, Stewart only addressed Stanton's encounters with plaintiffs and the adequacy of their insurance in 2003 and 2009. At trial, Stewart remained largely focused on those encounters, and his testimony concerning the 1998 notes was brief and consistent with his testimony during the N.J.R.E. 104 hearing. Stewart relied on the 1998 notes as additional support for the theory that Stanton was negligent by failing to properly advise plaintiffs of their insurance coverage requirements, and not in support of an

altered theory of negligence. See Gaido, supra, 227 N.J. Super. at 192.

We thus find no abuse in the court's discretion in allowing Charles or Stewart to testify concerning the 1998 notes because there was an absence of any design to mislead, and any prejudice to BHI was cured by the court's remedial measures.

### B. BHI's Motions for a Mistrial and New Trial

Following Stewart's testimony, BHI moved for a mistrial,[12] arguing again that BHI was prejudiced by the late production of the notes, and that the prejudice was compounded by the fact that counsel was not permitted to re-depose Michael or Stewart.[13]

The court denied BHI's motion, reiterating that Charles did not intentionally withhold the existence of the 1998 notes, and that the court took sufficient measures to eliminate any

---

[12] BHI inaccurately asserts that it moved for a mistrial twice: (1) during Charles's testimony on August 27, 2015, when the existence of the 1998 notes first became apparent; and (2) after Stewart's testimony. The record shows that BHI's counsel indicated that she might move for a mistrial depending on the court's remedial measures, but did not move for a mistrial until Stewart's testimony concluded.

[13] As noted, BHI was offered the opportunity to depose Stewart but opted not to do so. Michael was questioned briefly under oath concerning the 1998 notes and testified he had never seen them prior to the night before Charles's disclosure of them during the trial. In addition, there is no evidence Michael was present during the September 1998 meeting between Charles and Stanton referred to in one of the 1998 notes.

potential prejudice. The court noted that it allowed BHI's counsel to depose Charles, permitted counsel to question Michael on the record about his knowledge of the notes, conducted an N.J.R.E. 104 hearing regarding Stewart's testimony, afforded defense counsel the opportunity to depose Stewart, and allowed BHI's expert to opine about the notes without amending his expert report.

"The grant of a mistrial is an extraordinary remedy to be exercised only when necessary 'to prevent an obvious failure of justice.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Harvey, 151 N.J. 117, 205 (1997), cert. denied, 528 U.S. 1085, 120 S. Ct. 811, 145 L. Ed. 2d 683 (2000)). "For that reason, an appellate court should not reverse a trial court's denial of a mistrial motion absent a 'clear showing' that 'the defendant suffered actual harm' or that the court otherwise 'abused its discretion.'" Ibid. (quoting State v. Labrutto, 114 N.J. 187, 207 (1989)). "A decision by the trial court to deny a motion for a mistrial 'is reviewable only for an abuse of discretion.'" Khan v. Singh, 397 N.J. Super. 184, 202 (App. Div. 2007) (quoting State v. Winter, 96 N.J. 640, 647 (1984)), aff'd, 200 N.J. 82 (2009).

In exercising its discretion in deciding a mistrial motion, a trial court must consider the unique circumstances of the

case, and whether an alternative course of action short of a mistrial is appropriate. State v. Smith, 224 N.J. 36, 47 (2016). "For example, a curative instruction, a short adjournment or continuance, or some other remedy, may provide a viable alternative to a mistrial depending on the facts of the case." Ibid.

On appeal, BHI asserts the prejudice it suffered from the late production of the 1998 notes was not cured by the court's remedial measures. BHI asserts that the late disclosure of the notes prevented it from deposing John E. Loyle, who drafted the Thompson-Loyle appraisal report, and from obtaining any related documents pertinent to the report. BHI further asserts it would have approached its depositions of Charles and Michael with a focus on whether they relied on Stanton's advice over that of the appraiser of the Thompson-Loyle appraisal report, and retained an expert to opine concerning their decision.

As noted, we discern no prejudice to BHI in the admission of the testimony and evidence concerning the notes that was not directly addressed by the court's remedial actions during the trial. The record supports the trial court's decision that it undertook sufficient alternative actions to ameliorate any surprise or alleged prejudice created by the late discovery of the 1998 notes.

We are not persuaded by BHI's arguments that it would have pursued a different course of discovery had it known about the notes earlier. BHI obtained the Thompson-Loyle appraisal report during discovery and knew it was prepared in part by Charles's nephew, John E. Loyle, but chose not to depose him during discovery. In addition, BHI's assertion that it would have retained an expert to address plaintiffs' purported comparative negligence is contradicted by BHI's own position because BHI did not plead comparative negligence as an affirmative defense, and its expert's report did not opine that plaintiffs' disregard of the appraisal report constituted negligence.[14]

Moreover, and as noted, the 1998 notes did not establish BHI's negligence in 2009, when the policy at issue was sold by BHI. Again, the undisputed evidence showed that Stanton did not advise plaintiffs to obtain an appraisal at that time, there was no evidence Stanton calculated the value of the building and its contents at that time, and the jury was asked only to determine if BHI was negligent in its actions concerning the 2009 policy.

In sum, the court did not abuse its discretion in denying BHI's motion for a mistrial. BHI fails to make a clear showing that the court's denial of its mistrial motion constituted "an

---

[14] As explained _infra_, we affirm the trial court's decision barring BHI from pursuing a comparative negligence defense.

abuse of discretion that result[ed] in a manifest injustice."
Harvey, supra, 151 N.J. at 205.

For the same reasons, we reject BHI's claim that the court erred in denying its request for a new trial. "A trial judge may only grant a motion for a new trial 'if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law.'" Hill v. N.J. Dep't of Corr. Comm'r Fauver, 342 N.J. Super. 273, 302 (App. Div. 2001) (quoting R. 4:49-1(a)), certif. denied, 171 N.J. 338 (2002). A "miscarriage of justice" may occur where there is a "manifest lack of inherently credible evidence to support the [jury's] finding," or where it is obvious the jury overlooked or undervalued crucial evidence. Lindenmuth, supra, 296 N.J. Super. at 48 (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 598 (1977)).

In applying this standard, the judge must evaluate the evidence with an eye toward correcting "clear error or mistake by the jury." Dolson v. Anastasia, 55 N.J. 2, 6 (1969). The judge is to "take into account, not only tangible factors relative to the proofs as shown by the record, but also appropriate matters of credibility, generally peculiarly within the jury's domain, and the intangible 'feel of the case' which

it has gained by presiding over the trial." Kita v. Borough of Lindenwold, 305 N.J. Super. 43, 49 (App. Div. 1997) (quoting Dolson, supra, 55 N.J. at 6).

The court addressed BHI's new trial motion in a detailed and well-reasoned written opinion. For the reasons already noted, as well as those set forth by the trial judge, we find no miscarriage of justice in the jury's verdict and no merit to BHI's contention that the court erred in denying the mistrial motion. Hill, supra, 342 N.J. Super. at 302.

### III.

Next, we consider BHI's argument that the trial court erred in molding the verdict without crediting BHI $950,000 against the jury's damage award for the amount GNY received from Safe & Sound and S.S. Sprinkler. BHI contends it is entitled to the credit because GNY did not have a right to subrogation of plaintiffs' claims against the tortfeasors.

Subrogation is an equitable device designed "to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it [and] . . . to serve the interests of essential justice between the parties." Culver v. Ins. Co. of N. Am., 115 N.J. 451, 455-56 (1989) (quoting Std. Accident Ins. Co. v. Pellecchia, 15 N.J. 162, 171 (1954)). "In an insurance context, [subrogation] fulfills the dual purposes of avoiding

42

unjust enrichment to an insured who obtains recovery for the same injury from both his insurer and the tortfeasor and, in the absence of such double recovery, of precluding the tortfeasor from escaping all liability for damages that the tortfeasor has caused." McShane v. New Jersey Mfrs. Ins. Co., 375 N.J. Super. 305, 309-10 (App. Div. 2005).

Relying on Culver, supra, BHI claims GNY was not entitled to subrogation of plaintiffs' claims until plaintiffs were made whole. 115 N.J. at 456. BHI argues plaintiffs had not been made whole at the time GNY asserted claims against Safe & Sound and S.S. Sprinkler and therefore GNY did not have a subrogation right to assert claims on plaintiffs' behalf against the tortfeasors.

In Culver, the Court considered an insured's challenge to an agreement it reached with the insurer to divide the sums recovered by the insurer from the tortfeasors. Id. at 453. The insured sought a declaration the agreement was unenforceable in part based on the argument that BHI makes here: that the insurer had no right to subrogation because the insured had not yet been made whole. Id. at 452.

The Court rejected the argument, explaining that "[s]ubrogation rights are created in one of three ways: '(1) an agreement between the insurer and the insured, (2) a right

43

created by statute, or (3) a judicial "device of equity to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it."'" Id. at 456-59 (citations omitted). The Court recognized subrogation rights existed under the insurance policy, and that equitable principles generally permitted the assertion of subrogation rights only after an insured was made whole, but held that an insured and insurer could enter into an enforceable agreement permitting the insurer to assert subrogation rights prior to the insured being made whole. Id. at 457. The Court expressly rejected a requirement that "the insured be made whole first from the settlement of a subrogation action" where the insured and insurer had "a contractual agreement to the contrary." Id. at 459.

We therefore reject BHI's assertion that it was entitled to a credit for the $950,000 recovered by GNY from the tortfeasors because GNY could not properly assert subrogation rights on plaintiffs' behalf. Pursuant to the litigation agreement between GNY and plaintiffs, GNY was authorized to assert subrogation claims on plaintiffs' behalf without any requirement that plaintiffs first be made whole. See id. at 458-59. BHI's

contentions to the contrary lack merit.[15]

## IV.

BHI also argues the court erred by granting GNY's motion for summary judgment on BHI's indemnification claim because there were genuine issues of material fact concerning whether GNY owed a duty to BHI and plaintiffs. BHI asserts that GNY conducted annual inspections of the property and calculated a replacement value for the building that was used to determine the policy premiums, and therefore GNY owed BHI a duty to accurately calculate the building's replacement value. BHI contends GNY's actions in calculating a replacement value that BHI relied upon created a special relationship between GNY and BHI that imposed a duty on GNY to calculate the replacement

---

[15] Because we find no support in the law for BHI's contention that it was entitled to the $950,000 credit because GNY could not be properly subrogated to plaintiffs' rights until plaintiffs were made whole, we need not address plaintiffs' assertion that no credit was required because their agreement with GNY constituted a reasonable effort to mitigate their damages. We note only that plaintiffs had an obligation to take reasonable steps to mitigate their damages, Covino v. Peck, 233 N.J. Super. 612, 616 (App. Div. 1989), and that BHI does not dispute on appeal that plaintiffs' entry into the agreement with GNY constituted a reasonable effort to mitigate damages. BHI offers no evidence that the agreement or the agreed upon sharing of the proceeds was an unreasonable exercise of plaintiffs' duty to mitigate damages. See Prospect Rehab. Servs., Inc. v. Squitieri, 392 N.J. Super. 157, 164 (App. Div.), certif. denied, 192 N.J. 293 (2007); Covino, supra, 233 N.J. Super. at 619; Spaulding v. Hussain, 229 N.J. Super. 430, 444 (App. Div. 1988).

value accurately. BHI claims GNY breached that duty by understating the replacement value of the building, and the court erred by granting summary judgment by finding no duty existed.[16]

When reviewing a grant of summary judgment, we employ the same standard used by the motion judge under Rule 4:46. Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010). First, we determine whether the moving party has demonstrated there were no genuine disputes as to material facts, and then we decide whether the motion judge's application of the law was correct. Atl. Mut. Ins. Co. v. Hillside Bottling Co., 387 N.J. Super. 224, 230-31 (App. Div.), certif. denied, 189 N.J. 104 (2006). In doing so, we view the evidence in the light most favorable to the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995). We accord no deference to the motion judge's legal conclusions, which we review de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366,

---

[16] BHI sought indemnification against GNY only for plaintiffs' losses due to the underinsurance for the full replacement cost for the building. There was no evidence GNY conducted inspections or valuations of the contents of the bowling center to determine their replacement costs, or of plaintiffs' potential business interruption losses. Thus, BHI does not claim the court erred in dismissing its indemnification claim based on plaintiffs' underinsured losses for the replacement costs of the building's contents or the interruption of plaintiffs' business.

378 (1995). Applying these standards, and based on the summary judgment record provided by the parties on appeal,[17] we affirm the court's grant of GNY's summary judgment motion.

Notably, BHI alleged before the motion court that it was entitled to contractual indemnification from GNY in part because BHI was GNY's agent pursuant to an agreement between the parties. See Johnson v. MacMillan, 233 N.J. Super. 56, 61 (App. Div.) (holding that "[a]s a matter of elementary agency law, the negligence of an employee-agent is imputable to the employer-principal, who must answer for it"), remanded on other grounds, 118 N.J. 199 (1989); accord Mazur v. Selected Risks Ins. Co., 233 N.J. Super. 219, 226 (App. Div. 1989); Avery v. Arthur E. Armitage Agency, 242 N.J. Super. 293, 300-01 (App. Div. 1990). The court dismissed the claim, finding BHI was not entitled to indemnification pursuant to the agency agreement because BHI terminated the agreement on April 3, 2007, two years prior to the 2009 policy was executed. The record supports the court's finding, BHI does not point to any evidence in the record showing otherwise, and BHI does argue the court erred in

---

[17] We rely upon the documents, affidavits, deposition transcripts, and other materials that were submitted in BHI's appendix pursuant to Rule 2:6-1(a)(1)(I). BHI represents these materials comprised the record before the motion court, and GNY does not argue otherwise.

rejecting its agency theory on appeal. An issue not briefed on appeal is deemed waived. Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 525 n.4 (App. Div. 2008); Zavodnick v. Leven, 340 N.J. Super. 94, 103 (App. Div. 2001).

BHI challenges the court's dismissal of its indemnification claim to the extent the claim is premised on basic negligence principles. In order to prevail on a negligence claim, the plaintiff must prove: "(1) that the defendant owed a duty of care; (2) that the defendant breached that duty; (3) actual and proximate causation; and (4) damages." Fernandes v. DAR Dev. Corp., 222 N.J. 390, 403-04 (2015). The motion court dismissed BHI's indemnification claim finding there was no competent evidence supporting a finding that GNY assumed a duty of care to provide BHI or Stanton with an accurate valuation of the total replacement costs of the building. Based on our review of the motion record, we agree.

"The existence of a duty to exercise reasonable care to avoid risk of harm to another is a question of law." Fackelman v. Lac d'Amiante du Quebec, 398 N.J. Super. 474, 486 (App. Div. 2008). The existence of a duty "is largely a question of fairness or policy," and the inquiry involves the weighing of the relationship of the parties, the nature of the risk and the public interest in the proposed solutions. Wang v. Allstate Ins.

<u>Co.</u>, 125 <u>N.J.</u> 2, 15 (1991). "[T]he legal determination of the existence of a duty may differ, depending on the facts of the case." <u>Ibid.</u>

An insurer and its agents have "no common law duty . . . to advise an insured concerning the possible need for higher policy limits upon renewal of the policy. If such a duty would be in the public interest, it is better established by comprehensive legislation, rather than by judicial decision." <u>Wang</u>, <u>supra</u>, 125 <u>N.J.</u> at 11-12. However, it has been held that brokers are liable for the negligent procurement of insurance on behalf of an insured where the "broker agrees to procure a specific insurance policy for another but fails to do so." <u>Aden v. Fortsh</u>, 169 <u>N.J.</u> 64, 78 (2001); <u>accord</u> <u>Rider v. Lynch</u>, 42 <u>N.J.</u> 465, 477 (1964).

"Liability resulting from the negligent procurement of insurance is premised on the theory that the broker 'ordinarily invites [reliance] on his expertise in procuring insurance that best suits their requirements.'" <u>Aden</u>, <u>supra</u>, 169 <u>N.J.</u> at 78 (quoting <u>Rider</u>, <u>supra</u>, 42 <u>N.J.</u> at 477). "Because of the . . . complexity of the insurance industry and the specialized knowledge required to understand all of its intricacies, the relationship between an insurance agent [or broker] and a client is often a fiduciary one." <u>Sobotor v. Prudential Prop. &</u>

Casualty Ins. Co., 200 N.J. Super. 333, 341 (App. Div. 1984). The fiduciary duty exists in part because an agent or broker is sophisticated in the field of insurance and the client is not. Id. at 341-42. "Insurance brokers (and agents) have a responsibility in law to act toward their less expert clients in a way that is responsible in fact." Id. at 343 (quotation omitted).

The undisputed evidence showed that at all times relevant to the issuance of the 2009 policy, BHI and Stanton acted as independent insurance brokers. Generally, "[s]o separate are the broker and the insurer that when the insured recovers against the broker, the broker may not obtain indemnification from the insurer." Weinisch v. Sawyer, 123 N.J. 333, 341 (1991); accord Avery, supra, 242 N.J. Super. at 310-11. However, where a broker can establish that the insurer is negligent, the insurer owes a duty of contribution to the broker. See Johnson, supra, 233 N.J. Super. at 64 (explaining that "if [the insurer] had been negligent, it would have been a joint tortfeasor owing joint and several liability to plaintiffs and a duty of contribution to [the broker]"); see also Rider, supra, 42 N.J. at 475 (observing that regardless of the insurance broker's negligence, an insurer would be liable to the insured if it had been negligent in issuing the insurance policy).

Here, the motion court found GNY did not owe a duty to provide BHI with an accurate statement of the full replacement costs of plaintiffs' building because "no evidence has been presented that GNY agreed to take on the duty of valuing the insured's property." The undisputed facts support the court's conclusion.

The evidence showed that GNY only used the Marshall-Swift analysis internally, the valuation reports generated by the analysis were not provided to BHI or Stanton prior to the fire and subsequent lawsuits, and Stanton never communicated with GNY or Wu concerning the valuations. Moreover, the GNY policy Stanton sold to plaintiffs expressly provided that any inspections or reports undertaken by GNY related only to insurability and the premiums to be charged.

GNY never advised BHI that the 2009 policy limits were based on a dispositive determination of the building's full replacement costs. In addition, Stanton and BHI knew GNY would insure the building up to its appraised value and that the policy limit for the building's replacement cost could be increased to its appraised value, but did not recommend an appraisal in connection with the 2009 policy renewal.

As noted by the motion court, BHI produced no letters or certifications supporting its claim that GNY invited reliance on

51

its internal valuations that it used to determine insurability and premiums. BHI did not submit an expert report supporting its claim that GNY owed a duty to supply an accurate valuation of actual replacement costs. There is no evidence GNY made any representations that the policy limits it set based on its inspection and valuation constituted an accurate and complete statement of the full replacement costs for plaintiffs' building. Moreover, Doreen Dulowski, the only BHI employee who interacted with Wu and whose testimony was considered by the motion court, acknowledged in her deposition testimony that the most important factor in determining full replacement cost value was "an appraisal from [the] insured showing what their value is on [the] building."

Thus, BHI's reliance on GNY was not a matter of any imbalance of sophistication in the insurance industry or any information asymmetry between the parties. See Sobotor, supra, 200 N.J. Super. at 342-43 (considering that the insured was "not a sophisticated insurance consumer" in determining that an insurer and its agent had an affirmative duty to advise the insured that increased coverage was available, and breached that duty because the parties were not equally situated to make policy decisions). Rather, GNY, BHI and Stanton were sophisticated parties with expertise in the insurance industry,

BHI was well aware of its own independent duty to its client, see id. at 341-42, and of its own obligations under the renewal process to obtain the requisite information, including an appraisal, in order to accurately assess the replacement costs for plaintiffs' building.

As the motion court correctly recognized, the record is bereft of evidence that Stanton relied on any determination by GNY concerning the replacement cost of the building when he erroneously advised plaintiffs in 2009 that no additional coverage was needed. Stanton never spoke with GNY's underwriter, Wu. Thus, Stanton's deposition testimony concerning GNY's alleged actions constitutes inadmissible hearsay and is not competent evidence sufficient to defeat GNY's summary judgment motion. R. 1:6-6; Chicago Title Ins. Co. v. Ellis, 409 N.J. Super. 444, 457 (App. Div.) (explaining that hearsay statements "cannot be considered evidence in the summary judgment record showing a disputed issue of fact"), certif. denied, 200 N.J. 506 (2009).

In addition, the evidence showed that Stanton could not have relied upon any GNY valuation of plaintiffs' building at the time plaintiffs purchased the 2009 policy from him. First, the information submitted to BHI for the renewal of the policy indicated only that the coverage limits were based on the prior

year's policy. Second, although GNY provided BHI with policy renewal information in March 2009, and the policy was renewed in April, GNY's inspection that year was not completed until late May 2009. Therefore, neither BHI nor Stanton could have relied on any Marshall-Swift or other valuation analysis conducted by GNY when Stanton advised plaintiffs that no additional insurance was required and sold them the deficient 2009 policy. See Johnson, supra, 233 N.J. Super. at 62-63 (finding absent special circumstances, an insurance broker's negligence is not imputed to the insurer, and no special circumstances existed where broker was acting solely in insured's interests in evaluating its insurance needs and making recommendations).

In sum, we find no reason to disturb the motion court's finding that the evidence presented was insufficient to support BHI's claim that GNY acted in a manner that imposed a duty upon GNY to provide an accurate value of the full replacement costs of the building.

### V.

BHI's remaining arguments lack sufficient merit to warrant a written discussion in an opinion. R. 2:11-3(e)(1)(E). We offer only the following comments.

We reject BHI's contention that the court erred in precluding BHI from asserting comparative negligence against the

plaintiffs at trial. BHI did not plead comparative negligence as an affirmative defense, and thus, waived its right to the defense. R. 4:5-4; see also Brown v. Brown, 208 N.J. Super. 372, 384 (App. Div. 1986) ("[A]n affirmative defense is waived if not pleaded or otherwise timely raised."). In addition, BHI's argument that plaintiffs were aware BHI would rely on comparative negligence is not supported by the record and is contradicted by BHI's counsel's representation to the court. Following the close of discovery and denial of plaintiffs' summary judgment motion, BHI's counsel stated, "I am not claiming comparative negligence. I'm not even saying [plaintiffs] were negligent." Moreover, and as the court correctly recognized, New Jersey courts generally preclude comparative fault defenses in professional malpractice cases, and confine allegations of a client's negligence to issues of proximate causation. Aden, supra, 169 N.J. at 75-78.

We also reject BHI's argument that the court incorrectly instructed the jury that BHI had the burden of proving it relied on GNY's Marshall-Swift analysis in its determination of the replacement cost of the building. The instruction was proper because BHI asserted an affirmative defense that plaintiffs' losses were caused by "third parties over whom" BHI exercised no control, and BHI argued at trial that it relied on GNY. BHI had

the burden of proving its affirmative defense. <u>Walker Rogge, Inc. v. Chelsea Title & Guar. Co.</u>, 254 <u>N.J. Super.</u> 380, 387 (App. Div. 1992). In addition, BHI did not object to the proposed instruction, and we find no plain error in its use, <u>R.</u> 2:10-2, because the jury was properly instructed concerning what plaintiffs were required to prove to sustain their cause of action against BHI. We therefore discern no basis to conclude the challenged instruction was clearly capable of producing an unjust result. <u>Bldg. Materials Corp. of Am. v. Allstate Ins. Co.</u>, 424 <u>N.J. Super.</u> 448, 487 n.14 (App. Div.), <u>certif. denied</u>, 212 <u>N.J.</u> 198 (2012).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION